62          SUPREME COURT OF WISCONSIN.          [80

The West Koshkonong Congregation and others vs. Ottesen.

THE WEST KOSHKONONG CONGREGATION and others, Respond-
ents, vs. OTTESEN, Appellant.

*May 9 — June 3, 1891.*

*Religious societies: Incorporation: Notice: Withdrawal and expulsion of
members: Officers* de facto : *Title to land: Estoppel.*

1. Under sec. 1990, R. S. (providing that the members of a church may,
   " after due public notice given at some stated meeting of such
   church," organize a corporation, etc.), where the minister had re-
   fused to read the notice, the reading thereof by a church member
   at the close of the regular Sunday service, such reading having been
   commenced before any of the congregation had left, was sufficient.
   *Kulinski v. Dambrowski,* 29 Wis. 109, distinguished.
2. There being two factions in a church, each claiming to be the church
   and entitled to the use, enjoyment, and control of its temporalities,
   the members of one faction did not withdraw from the church by
   keeping up a separate organization, holding separate services under
   another pastor, supporting only their own organization, attempting
   to discharge the original pastor, and worshiping at separate times.
3. The action of one faction in declaring, without notice, hearing, or
   evidence, the members of the other faction to be withdrawn or sus-
   pended from the church, will be given no effect in a civil action in
   volving property rights.
4. The fact that one faction — even though a majority — took no part in
   the incorporation of the church, cannot affect the proceedings, if
   due notice was given.
5. For the purposes of an action by the corporation to recover posses-
   sion of its property, it is immaterial that its first meeting for the
   election of officers was not called in the manner provided by law.
   It is sufficient that it has officers *de facto.*
6. A minister of several religious societies who was let into possession
   of their joint parsonage under an agreement that he should have
   the use thereof as part of his compensation, cannot, in an action to
   recover possession of the premises after the termination of his min-
   istry, dispute the title of such societies ; and it is immaterial that
   they have in the meantime become incorporated.

APPEAL from the Circuit Court for *Dane* County.

The action is ejectment brought by three religious organ-
izations known respectively as *The West Koshkonong Con-*

*gregation*, *The Eastern Koshkonong Congregation*, and *The Norwegian Evangelical Lutheran Church of St. Paul's on Liberty Prairie*, against the defendant, *Ottesen*, to recover possession of ninety acres of land, constituting the joint parsonage of the three congregations, and which in fact was occupied by the defendant at the time of the commence- ment of the action, he claiming to be the pastor of all of said congregations.

Many facts relating to the history of these three relig- ious organizations and their previous difficulties will be found by consulting the statements of facts and the opin- ions in the cases of *Evenson v. Ellingson*, 67 Wis. 634; *Evenson v. Ellingson*, 72 Wis. 242; *Fadness v. Braunborg*, 73 Wis. 257. Two of the voluntary religious societies of which the plaintiffs claim to be the legal successors came into existence in or about the year 1844. They were called the " Eastern Congregation on Koshkonong " and the " Western Congregation on Koshkonong," and sometimes only the " Eastern Church " and the " Western Church ; " and they built separate church buildings some seven miles distant from each other. Though managing their spiritual affairs to a certain extent separately, and having separate and distinct lists of members, these two congregations were served by the same pastor, and they met together jointly, at least annually and frequently oftener, for the transac- tion of business, election of trustees, and the general man- agement of their temporal affairs; and they termed them- selves in their joint capacity " Koshkonong's Norwegian Evangelical Lutheran Congregation or Congregations in Dane and Jefferson Counties." The first pastor called was one J. W. C. Dietrichson, who served both congregations in that capacity from 1845 to 1850, when he was succeeded by Rev. A. C. Preus, who was also called by both congrega- tions, and served them as pastor until about the year 1860. In 1852 a third voluntary religious society was formed,

which was practically an offshoot of the Western Congregation, called "*The Norwegian Evangelical Lutheran Church of St. Paul's on Liberty Prairie*," and which erected a church building in 1853, near Deerfield in Dane county, and this last-named association was thereafter served by the same pastor as the two first-named congregations, at least until the breaking out of the doctrinal troubles in the congregations hereinafter referred to. This new congregation was also admitted to the joint business meetings before referred to, and participated in the transaction of business.

On the 14th of January, 1847, twenty acres of the land in dispute was purchased of one Knud Olson, and the deed thereof ran to Rev. J. W. C. Dietrichson " and his successors, for the use of him and his successors in the ministry of the Norwegian Lutheran Congregation, forever." The records of the congregations, kept by Mr. Dietrichson at the time, and signed by him, were introduced in evidence against objection, and show that the question of the manner of the execution of this deed and the grant was discussed and settled by the joint body, as follows: " It was agreed, too, that the most proper form of the deed would be to vest the title in the minister and his successors in office as ministers for the Norwegian Lutheran Congregation. Both lands and buildings would then be secured for the use for which they were intended, and all difficulties avoided. It naturally follows that such a form of deed cannot give the present minister nor his successors in office any other right to the property than he should have as minister, namely, to use the property as long as he is in office." Afterwards, on the 20th of November, 1865, Olson and his wife conveyed by quitclaim the same twenty acres to the Norwegian Lutheran Congregation in the counties of Dane and Jefferson " to the said congregations, their successors in office, duly elected, forever." The object of this deed is alleged and admitted to have been to convey the right of dower of Olson's wife in the premises.

. On the 22d day of March, 1851, Knud Olson and wife deeded another tract of ten acres, also being part of the lands in controversy, to Rev. Adolph C. Preus " and his successors in the ministry of the Norwegian Lutheran Congregation of Dane county, Wisconsin."

The remaining sixty acres of the ninety acres in dispute was deeded November 8, 1858, by Rev. A. C. Preus to the " Norwegian Lutheran Church on Koshkonong's Prairie in the counties of Dane and of Jefferson," in consideration of $1,450 paid. On December 18, 1857, a joint meeting of the trustees, deacons, and pastor of the three congregations was held, at which meeting the subject of the purchase of this sixty acres was considered; and the record of that meeting was received in evidence against objection, and contains, among other matters, the following resolution: " (1) The congregation shall buy sixty acres of land as follows, which, together with the thirty acres belonging to the congregation, shall continue to be and remain the common property of these three congregations, on the same conditions as the other thirty acres, and constitute a parsonage for the use and occupation of the members of these congregations." This record was signed by the Rev. A. C. Preus.

The Eastern and Western Congregations attempted to form themselves into one religious corporation in 1847, and again in 1853, but these attempts were held void by this court in *Evenson v. Ellingson*, 72 Wis. 242. The Liberty Prairie Congregation became duly incorporated in 1862.

In 1858 the defendant, *Ottesen*, was called to be pastor of the three congregations by a joint call, which contained, among other provisions, the following as to his compensation: " And recognizing that those who preach the gospel shall live of the gospel, we are heartily willing to comply with this precept, and have in this respect provided as follows: (1) A fixed annual salary, which has hitherto been

The West Koshkonong Congregation and others vs. Ottesen.

$300; and (2) a donation on the principal church festivals; also a fee for ministerial services, the amount to be optional with the giver. (3) The use and benefit of the parsonage of ninety acres, the buildings and fences of which are to be kept in repair by the pastor." Said call originally contained the following clause: " Should you, reverend pastor, or the church, at any time desire to rescind this call, then you as well as the church ought to be notified betimes, which is held to be one year in advance." But this latter clause was expunged before the call was accepted. In accordance with this call, the defendant became the pastor of the three churches in 1860, and entered into occupation of the parsonage lands in controversy.

About ten years ago a controversy arose in the three congregations on the doctrine of election. The majority of the Liberty Prairie Church and of the Western Church and the minority in the Eastern Church favored what was called the " Anti-Missourian " side of the controversy. The majority of the Eastern Church and the minority of the Liberty Prairie and the Western Churches favored the Missourian side of the controversy. The pastor, the *Rev. Mr. Ottesen,* favored the Missourian view; so that his side was in the minority in two of the churches, and in the majority in the Eastern Church. This controversy became very bitter, and has raged fiercely up to the present time, and has been the cause of all the litigation in the churches. The anti-Missourians, being in the majority in the Liberty Prairie and the Western Churches, controlled the church edifices, and for a part of the time excluded the Missourian faction from the use of the building. The Missourian party controlled the Eastern Church, and at various times closed the church to the anti-Missourians. For the greater part of the time, however, the three churches have been opened to the use of both parties. In April, 1884, the following resolution was adopted by the Liberty Prairie Church, at a

meeting over which the defendant presided: " I move that we permit Reverend Saevig to accept the proffered call from Wyota, and that the *Reverend Ottesen* serve the congregation the coming year with such help as he can obtain under the circumstances, provided this help be of both parties; and, as the pastor is old and feeble, and cannot for any length of time serve these three congregations himself, that he then, next year, voluntarily resign, that the existing strife be allayed, and that the congregation then try to unite in calling another pastor." This resolution was subsequently substantially adopted by both the Eastern and Western Churches. The defendant, in November, 1885, called a joint meeting of the Eastern and Western Congregations by a notice in which he stated that he had determined to resign if the congregation could agree upon calling a new pastor in his place, and that the meeting was called to consider that subject. At the meeting held under this notice, December 17, 1885, the following resolution was passed: " Whereas, a part of the Eastern and Western Congregations cannot conscientiously make use of the *Reverend J. A. Ottesen* as their pastor, therefore, be it resolved that they shall not be prevented from making use of another pastor for temporary services, and that the use of the Eastern and Western Churches for public services at such times as the *Reverend J. A. Ottesen* does not conduct divine services in such churches shall not be denied to them." The defendant, however, did not resign, and since that meeting the factions have held separate services, the anti-Missourians in the three churches being served by Reverend G. G. Krostu, and the Missourians by the defendant. Both factions in each of the three churches have maintained separate organizations, and have contributed only to the support of their own faction; and the Missourians in the Eastern and Western Congregations resolved that the opposing faction had withdrawn and separated from the church and was cut off from fellowship.

In the latter part of the year 1888 steps were taken by the anti-Missourian faction in the Eastern and Western Congregations to incorporate the two societies separately under the statute. No substantial contest is made as to the validity of the proceedings for the incorporation of the Western Church, but it is claimed by the appellant that the proceedings to incorporate the Eastern Church are void, because not in conformity with the statute. A sufficient statement of the manner in which the incorporation of the Eastern Church was effected will be found in the opinion. After the incorporation of these two societies, resolutions were passed by each of the three corporations terminating the pastoral relations of the defendant, authorizing the commencement of this action, and the giving of notice to quit to the defendant, which notice was given.

At the close of the trial the circuit court directed a verdict for the plaintiffs with nominal damages. The defendant appealed.

For the appellant there was a brief signed by *I. C. Sloan* and *John Ollis*, attorneys, and *Wm. F. Vilas*, of counsel, and a supplemental brief signed by the same attorneys and *Geo. W. Bird*, of counsel, and the cause was argued orally by *Mr. Ollis* and *Mr. Bird*. They contended, *inter alia*, that the plaintiffs had no legal title to the premises in question. The title was in the minister by the very terms of the deeds, and the interest of the society or congregation, if any, was only equitable, and they could not maintain ejectment. *Gillett v. Treganza*, 13 Wis. 472; *Eaton v. Smith*, 19 id. 537. The deed from Preus to "The Norwegian Lutheran Church on Koshkonong Prairie," etc., was void because the church was not incorporated, was not organized so that the law would take notice of its existence, and hence it could not be the grantee of land. *Jackson v. Cory*, 8 Johns. 388; *Hornbeck v. Westbrook*, 9 id. 74; *Harriman v. Southam*, 16 Ind. 190; *Owens v. Missionary Soc. M. E. Church*, 14 N. Y.

380; *Reformed Church v. Schoolcraft*, 65 id. 155; *Sloan v. McConahy*, 4 Ohio, 157; *German Land Ass'n v. Scholler*, 10 Minn. 331. The grant to the successors of the minister was void for uncertainty. 3 Washb. Real Prop. (5th ed.), 280; *Thomas v. Marshfield*, 10 Pick. 368; *Hogg v. Odom*, Dud. (Ga.), 185. The conveyances to Dietrichson and Preus, as ministers of the church or congregation, created at most life estates in them, which would terminate on their ceasing to be such ministers.

At the time the deeds in question were executed, the congregations interested were voluntary, unincorporated religious associations. If they acquired any property by virtue of those deeds, their members became seised thereof as joint tenants or tenants in common; and when those voluntary associations became divided, each into two congregations, the members of the latter continued to be so seised, and each congregation entitled to use and enjoy the property in common with the other, and to have it divided between them in proportion to their respective memberships. *Farraria v. Vasconcellos*, 31 Ill. 25; *Nichols v. Rugg*, 47 id. 47; *Higgings v. Riddell*, 12 Wis. 586; *Avery v. Baker*, 27 Neb. 388; *Arts v. Guthrie*, 75 Iowa, 674; *Burke v. Roper*, 79 Ala. 138; *S. C.* 83 id. 193; *Ryam v. Bickford*, 140 Mass. 31; *Hewett v. Hatch*, 57 Vt. 16; *Burke v. Wall*, 29 La. Ann. 38; *East Haddam Baptist Church v. East Haddam Baptist Soc.* 44 Conn. 259; *Hale v. Everett*, 53 N. H. 9.

The members of the anti-Missourian faction of the Eastern congregation had withdrawn from that congregation and were no longer members thereof when they attempted to incorporate under the statute. *People v. Tuthill*, 31 N. Y. 550; *M. E. Church v. Wood*, 5 Ohio, 283; *Wiswell v. First Cong. Church*, 14 Ohio St. 31; *Trustees v. Sturgeon*, 9 Pa. St. 321; *Baker v. Fales*, 16 Mass. 503; *Denn v. Bolton*, 12 N. J. Law, 214; *McGinnis v. Watson*, 41 Pa. St. 9.

*S. U. Pinney* and *A. L. Sanborn*, attorneys, and *John*

*M. Olin*, of counsel, for the respondents, argued, among other things, that the plaintiff corporations had succeeded to and represented all the rights and interests of the voluntary organizations under which the defendant entered; and he cannot, therefore, dispute their title. The voluntary organizations obtained possession and held it until the creation of the plaintiff corporations, when the rights of all the individual members of the congregations passed to the corporations, so that they got the full equitable title. *African M. E. Church v. Conover*, 27 N. J. Eq. 157; *Mannix v. Purcell*, 46 Ohio St. 102; *Fink v. Umscheid*, 40 Kan. 271; *Christian College v. Hendley*, 49 Cal. 347; *Willard v. Trustees*, 66 Ill. 55.

As to the statute law of Wisconsin in relation to the succession of incorporated religious societies to the property and estate of the voluntary organizations which almost universally precede them, see R. S. 1849, ch. 47, sec. 6 (section borrowed from statute of New York of 1813, under which *Baptist Church v. Witherell*, 3 Paige, 296, and *Trustees v. Bly*, 73 N. Y. 323, were decided); R. S. 1849, ch. 47, sec. 21 (section derived from Michigan); R. S. 1858, ch. 66, secs. 8, 23; Laws of 1860, ch. 337; Laws of 1862, ch. 103; Laws of 1876, ch. 411; R. S. 1878, sec. 1992 (amended by ch. 79, Laws of 1883), and sec. 2000. Where a grant is made to individuals for the use of a church which, at the time, is not incorporated, the grantees stand seised to the use, and when the church afterwards acquires a legal capacity to take and hold real estate, the statute executes the possession to the use and the legal estate vests. *Reformed Dutch Church v. Veeder*, 4 Wend. 494, 496; *Reformed P. D. Church v. Brown*, 4 Abb. Ct. App. 32; *Baptist Church v. Witherell*, 3 Paige, 296, 299; *Church of Redemption v. Grace Church*, 68 N. Y. 570; *Trustees v. Bly*, 73 id. 323; *People ex rel. Fulton v. Fulton*, 11 id. 94; *Van Deuzen v. Trustees*, 4 Abb. Ct. App. 465.

There was no secession or removal of the anti-Missourian party from the Eastern congregation. It was a clear case of schism upon doctrinal points, and was in all material respects like the case of *Trustees v. Bly*, 73 N. Y. 328. See, also, *McKinney v. Griggs*, 5 Bush (Ky.), 401. The excommunication of that party without charge or notice or opportunity for hearing or defense, was void. In respect to church judicatories, it is well settled that they must have jurisdiction both of the subject matter and of the parties. Hoffman, Ecclesiastical Law, 276; *Long v. Bishop of Capetown*, 1 Moore P. C. (N. S.), 411, 461; *Bishop of Natal v. Gladstone*, L. R. 3 Eq. 1; *McMillan v. Free Church of Scotland*, 23 Sess. Cas. Scot. 1314; *Comm. v. Green*, 4 Whart. 603; *Watson v. Avery*, 2 Bush (Ky.), 332; *Watson v. Garvin*, 54 Mo. 364; *McAuley's Appeal*, 77 Pa. St. 397; *Smith v. Nelson*, 18 Vt. 511; *Loubat v. Le Roy*, 40 Hun, 546; *Windsor v. McVeigh*, 93 U. S. 274.

WINSLOW, J. The first question which naturally presents itself for decision in this action is as to the validity and effect of the proceedings taken to incorporate the Eastern Church. It stands admitted on the pleadings that the Liberty Prairie Church was duly incorporated in 1862. The proofs leave no doubt as to the regularity of the proceedings to incorporate the West Church; but it is most vigorously contended by the appellant that the Eastern Church has never been legally incorporated, and consequently has no standing in court. The facts are not seriously in dispute. It appears that at the time of the alleged incorporation of the Eastern Congregation the Missourian faction, who were supporters of the defendant, were in control, and had excluded the anti-Missourian faction, who supported Rev. Mr. Krostu, from the church building. The anti-Missourians were holding their meetings at a neighboring school-house. On the 3d of November, 1888, one

Nicholas Anderson and four others, all members of the anti-Missourian faction, made and signed a written notice, calling a meeting of the Eastern Congregation at the Eastern Church on the 24th day of the same month, for the purpose of considering the question of organizing said church into a corporation under the provisions of ch. 91, R. S., and of making the certificate prescribed by sec. 1991, in case the meeting decided to organize the corporation. Anderson took the notice, and went to the church at a regular meeting held on Sunday, November 4, 1888, and posted copies on both the outside and inside doors of the hall or vestibule. He also requested *Mr. Ottesen* to read the notice to the congregation, which *Ottesen* refused to do. Anderson then sat down in the congregation, and at the close of the service arose in his place, and commenced to read the notice as the audience were just arising to pass out, and as the church warden was commencing to ring the bell. *Ottesen* attempted to stop the reading of the notice, but it was completed while the audience was passing out. The notice was also read at a regular meeting of the Krostu faction, held at the school-house. At the meeting held pursuant to this notice on the 24th of November, outside of the church (the building being locked), the five signers of the notice were authorized to execute and acknowledge the certificate required by sec. 1991, R. S., and they subsequently executed the certificate and caused it to be recorded. Apparently the *Ottesen* faction did not participate in the meeting, although they had full notice of it. The notice of the first meeting of the corporation for the election of officers was given in substantially the same manner.

It is first objected by the appellant that the original notice was not given *at* a stated meeting of the church, but *after* it. This objection hardly deserves serious attention. The notice was read just after the benediction was pronounced, and the reading was commenced before any of

the congregation had left.   To say that this was not given
at the meeting would be hypercritical.   It is also objected
that the notice should have been read by the pastor, elder,
deacon, or some one in authority, and who usually gives
such notices.   This objection also is untenable.   The case
of *Kulinski v. Dambrowski*, 29 Wis. 109, cited by appel-
lants, is very plainly distinguishable from the present case.
In that case the statute then in force provided for the read-
ing of the notice by the minister, or by one of the elders,
deacons, wardens, or vestrymen; and, it not appearing that
the notice was so given, the corporation was held never to
have been formed.   Now, however, the statute simply pro-
vides for due public notice given at a stated meeting.   It
does not in terms require the notice to be given by any par-
ticular person, and it ought not to be so construed as to
hinder or bar the formation of a corporation, because it is
for the interest of the public, as well as for the interest of
the congregation itself, that it should have a legal corpo-
rate existence, rather than that it should exist as an intan-
gible, voluntary association.   It seems to us that where the
notice was given, as in this instance, by a church member
at a stated meeting, publicly, and in a manner which must
have arrested the attention of every one present, especially
after the officiating minister had declined to read it, justice
requires that it be considered " due " notice.   The prime
object for which the notice is required, namely, to give
knowledge of the meeting to all concerned, was fulfilled.
*Trustees v. Bly*, 73 N. Y. 323.   So we conclude that due
public notice was given at a stated meeting, and, conse-
quently, that a corporation was formed by the filing and re-
cording of the certificate which the meeting called by that
notice authorized to be filed.

   But it is here objected that, even if a corporation was
created by these proceedings, it was simply a corporation
of the anti-Missourian faction, and did not represent nor

succeed to the rights of the pre-existing voluntary organization known as the "Eastern Church;" in other words, that the anti-Missourian faction had not only seceded from but had been expelled from the Eastern Church, and consequently could form no corporation which would include or become the legal successor of the voluntary organization known as the "Eastern Church." This objection demands careful consideration, because, if the anti-Missourians were not members of the Eastern Congregation, they could not give the notice required by sec. 1990, R. S., nor execute the certificate required by the following section, which must be executed by members of the society. The question is, Were the members of the anti-Missourian minority still members of the Eastern Church? It is undeniably true that they were members of that church up to the time of the troubles in 1885 or 1886. Have they lost their membership since that time? Now, if they have lost their membership, it must be in one of two ways,— either by voluntary withdrawal or by expulsion. They have not by any formal declaration announced their withdrawal, but it is claimed that their acts in keeping up a separate organization, holding separate services under another pastor, supporting only their own organization, attempting to discharge the defendant as pastor, and worshiping at separate times, constitute an effective withdrawal. Certainly there was a deplorable division in the church; certainly there was abundance of ill feeling and intolerance on both sides; but was it not rather a desperate factional fight in the church than a withdrawal or secession from it? Did not both parties claim at all times, in season and out of season, that their faction was the church? Did not each party strenuously insist that it, and it alone, was the true and only Eastern Church, and entitled to the use, enjoyment, and control of its temporalities? There was in fact a division and separation between the two factions, but it was manifestly a division *in* the

church, a fight for control, a contest for supremacy within the church, rather than a secession from it. Such is the view we take of it, and this view disposes of the question of withdrawal.

We cannot entertain for a moment the idea that the action of the Missourian faction in the Eastern Church in March, 1887, by which they attempted to declare the anti-Missourians as withdrawn or suspended from the church, has in fact affected the rights of the anti-Missourians in the least. This action was without notice, without hearing, and without evidence; and, while the civil courts will studiously give full effect to the judgment of an ecclesiastical court when matters ecclesiastical only are involved, when civil rights as to property are involved the civil courts will insist that an accusation be made, that notice be given, and an opportunity to produce witnesses and defend be afforded, before they will give effect to an expulsion or suspension of the kind here attempted. Hoffman, Ecclesiastical Law, 276, 277.

The conclusion follows that the attempted incorporation of the Eastern Church was a legal incorporation of the entire church; and that it succeeded to the rights of the voluntary organization. It avails not to say that the Missourians did not take any part in the proceeding, and that the majority are thus placed under the control of the minority. They could have prevented the result if they were in the majority, or could have controlled the corporation; but they chose to stay away from the meeting, and must abide the consequences.

The objection that the first meeting for election of officers was not called in the manner provided by sec. 1993, R. S., is immaterial. The corporation exists. It has at least *de facto* officers, and that is sufficient for the purposes of this action.

It is further insisted by the appellant, and evidence was

offered tending to show, that by the custom of the Nor-wegian Lutheran Church the engagement of the pastor is for life, and is indissoluble except for false doctrines, im-moral life, neglect of duty, or mutual consent.   This con-tention· was substantially considered· and passed upon by this court in *Fadness v. Braunborg*, 73 Wis. 257, adversely to the views of appellant.   Although that decision is not *res adjudicata* in this case, we .see no occasion now to re-consider or modify the conclusion there reached.

The only remaining question of importance is the ques-tion of title to the lands in dispute, or rather, perhaps, whether appellant is in a situation to contest the plaintiffs' claim of title.   The joint call which appellant accepted, and under which he became the pastor of the three voluntary. societies, provided, among other things, that the pastor should have " the use and benefit of the parsonage of ninety acres."   Under this call and its acceptance by him he com-menced his pastoral labors, and went into possession of the parsonage.   He was let into possession by the societies. He recognized and admitted their title.   Upon the plainest and most familiar principles of law he cannot now dispute it, and it makes no difference that the plaintiffs are · corpo-rate bodies, because they have succeeded to all the rights of the voluntary organizations whose places they have taken. The defendant is estopped from disputing their title; and, the relationship of pastor having been terminated, and no-, tice to quit given, he must vacate the premises.   Under this view, it becomes unnecessary to consider the actual state of the legal title to the lands in dispute.   Many of-fers of .evidence were made by the appellant, and excluded by the trial court.   Even had this evidence all been admit-. ted, it would not have materially affected our view of the case, and, as counsel will perceive, we have discussed the case as if most of the evidence excluded was in fact ad-, mitted.

This is a purely legal action, and we have discussed purely legal rights. Whether the minorities in these congregations have any equitable rights in the property of the churches is not in issue, and consequently not decided.

*By the Court.*— The judgment of the circuit court is affirmed.