## KOMARYNSKI v. POPOVICH.

1. RELIGIOUS SOCIETIES—CHURCH PROPERTY—RIGHT TO POSSESSION —REMOVAL OF TRUSTEES.

The summary removal of the trustees of a religious corporation, the forcible seizure of its property from their possession, and the divesting it of its title thereto, contrary to its articles of association and by-laws and without color of law, held, illegal and void.[1]

2. SAME—FACTIONAL DIFFERENCES—COMPROMISE AND SETTLEMENT.

The offer of plaintiffs, trustees of a religious corporation who had been forcibly dispossessed of its property and summarily removed from office, to abide by the decision of the administrator of the diocese in the settlement of differences with a rival faction, which was never acted upon, may not be said to amount to a settlement of said differences.[2]

3. SAME—CHURCH AFFILIATIONS—ERRONEOUS STATEMENT IN PLEADING.

An erroneous statement in plaintiffs' pleading in another suit that the church corporation of which they were trustees was under the supervision of the Russian Greek Catholic Church, which was later disavowed, did not have the effect of putting it without the pale of the Greek Catholic Church, under whose auspices it was organized, or foreclose its right to the possession and ownership of the property it had acquired.[3]

4. SAME—PROPERTY RIGHTS TESTED IN CIVIL COURTS.

In matters of church polity purely ecclesiastical, civil courts do not interfere, but when property rights are involved they are to be tested in the civil courts by the civil laws.[4]

5. SAME—PARTIES.

Relief asked as to title to realty against persons not made parties to the suit cannot be considered.[5]

[1]Religious Societies, 34 Cyc. pp. 1133, 1135; [2]Id., 34 Cyc. p. 1133 (Anno); [3]Id., 34 Cyc. p. 1160 (Anno); [4]Id., 34 Cyc. pp. 1170, 1182, 1183; [5]Id., 34 Cyc. p. 1172.

6. SAME—CHURCH PROPERTY—RIGHT TO POSSESSION—INJUNCTION.
    Plaintiffs, trustees of a religious corporation who were removed from office and their successors elected in violation of its charter and without color of law, and who were forcibly dispossessed of the corporation's property, are entitled, as against the defendants in this suit, to the injunctive relief asked restraining defendants, their successors or substitutes, from assuming to act as trustees of said corporation, from withholding from the possession of plaintiffs its property or interfering with them in the management and control of its corporate property, both real and personal, including its seal, books, and records.[6]

7. SAME—ACCOUNTING.
    Plaintiffs' claim for an accounting, which is not properly presented, either in pleadings or proofs, is dismissed without prejudice.[7]

Appeal from Wayne; Dingeman (Harry J.), J. Submitted January 7, 1925. (Docket No. 33.) Decided October 1, 1925.

Bill by John Komarynski and others against Andrew Popovich and others for an injunction and an accounting. From a decree dismissing the bill, plaintiffs appeal. Reversed.

*Ernest N. Pappas,* for plaintiffs.

*Dennis B. Hayes* (*G. F. McGraw,* of counsel), for defendants.

STEERE, J.    This case was formerly here on appeal from a decree dismissing plaintiffs' bill for the reason it presented no grounds for equitable relief, and their remedy was trial of title to the office of trustee by *quo warranto* proceedings on the law side of the court (218 Mich. 481). This court there held something more than trial of title to office was involved under the issues made by the pleadings and reversing the order dismissing the bill remanded the case for a hear-

---

[6]Religious Societies, 34 Cyc. p. 1174; [7]Id., 34 Cyc. p. 1174 (Anno).

ing on the merits.  A hearing was thereafter had resulting in a decree dismissing the bill and plaintiffs have appealed therefrom.

In 1907 a community of emigrants of the Ukranian race from southeastern Europe who had located in Detroit organized a religious association of their faith and incorporated it pursuant to Act No. 209, Pub. Acts 1897 (3 Comp. Laws 1915, § 10889 *et seq.*), under the name "St. John's Greek Catholic Church."  Bylaws were adopted as the act requires providing among other things for a president, vice-president, secretary, treasurer and vice-treasurer to be elected at the annual meeting of church members, their terms of office to be one year "and until their successors are elected and qualified."  A board of trustees to "conduct the business of the church" was provided for, to consist of the five officers named and three other members to be annually elected as trustees, five of the eight to constitute a quorum.  The pastor of the church was to be an *ex-officio* member without the right to vote, and made subject to removal by the board of trustees, "at any time for any cause," upon 90 days' notice.  The place of worship was to be "located in the city of Detroit, county of Wayne, Michigan."  Title to all property of the corporation both real and personal was to be "held in the name of St. John's Greek Catholic Church."

A suitable site for church purposes was purchased consisting of five lots on Cicotte avenue conveniently located for that community, upon which the corporation established a church edifice, parsonage, parish hall and school building, employed a pastor of their race and faith, and a teacher, attained a membership of about 400 and there harmoniously maintained for nearly ten years an apparently prosperous parish of their denomination, accepted by and submitting to the jurisdiction of Bishop Ortinski in whose diocese its location placed it.  The parish was always self-sustaining and

at the time these troubles developed had reduced its indebtedness to a mortgage of $1,500 on its church property, which is admitted to be worth $40,000.

Although no mention is made in its articles of association of nationality or race, it appears undisputed that in race and religious affiliations it was known to the laity and recognized by ecclesiastical authorities as a "Ukranian Greek Catholic Church," and the first of the kind established in Detroit. As such it differs radically both from the older Orthodox Greek Church and the Russian Greek State Church, being neither subject to the Orthodox Greek Church patriarchate nor the Holy Synod of Russia, but recognizes allegiance to and is in communion with the Latin or Roman Catholic Church, subject in essentials of religious belief to its Pontiff, being of the Greek Church order known as "Uniate Churches." Such churches are united with the Roman Catholic Church and subject to the jurisdiction of its Pope in the fundamentals of religious belief and faith, accepting its doctrines and dogmas, but conceded by it a distinctive church organization and name, served by their own clergy under bishops appointed by the Pope. They retain their "rites," of ritual or liturgy, discipline, permission for their clergy to marry and other distinctive Greek Church usages, more or less modified as found requisite for harmonious union.

Development of this uniate branch or auxiliary of the Roman Catholic Church, until recently but little known in the west, began centuries ago in the Eastern Europe and Western Asiatic countries, where the Orthodox Greek and Roman Catholic churches occupied the field in religious rivalry. The Ukranians are and were a numerous people of the Slavic race inhabiting southeastern Europe, mainly north of the Black sea within the confines of that portion of the former Russian empire which was known as Southern or Little Russia, as distinguished from Northern or

White Russia.    In recent years many people of that
race who were uniates immigrated to this country and
in the communities where they settled established
uniate or Greek Catholic churches in sufficient number
for the United States to be created a diocese under
a bishop appointed from the clergy of that faith and
form of worship by the Roman Pontiff.

The period of prosperity and development of the
St. John's Greek Catholic Church on Cicotte avenue
was during the administration of the "Rt. Rev. Father
Lord Bishop Ortinski" who died some years ago, ap-
parently early in 1916, although the date of his death
is not positively shown.    On April 11, 1916, the
Apostolic Delegate of the Roman Catholic Church
located at Washington, D. C., appointed the "Rev. Lord
Peter Poniatishin, priest," of Newark, N. J., to be
"Administrator of the Ruthenian Faithful in the
United States of North America until the Apostolic
See shall be pleased to dispose otherwise;" further in-
forming him that his "jurisdiction must only be exer-
cised within the limits of the ordinary administration
of the diocese," admonishing him that at the time
his "administration of this office shall cease you will
be held to render a strict account of your office to
the Right Reverend Father Lord Bishop who may be
chosen by the Apostolic See for the Ruthenians of
this country;" and commanding him that his "gift
and office must be restricted solely within the limits
of the Ruthenian clergy and people of the Galician
nation."    It was shown without dispute that in the
connection used, "Ruthenian" and "Ukranian" are
interchangeable names, the Ruthenians of Austria and
Ukranians of Russia being of the same Slavic race.

Early in the interregnum of Poniatishin as admin-
istrator over this diocese differences had developed
amongst the members of this Detroit Greek Catholic
Church over retention of their pastor, Father Sterniuk,
who was sent to them during the administration of

Bishop Ortinski and had been their pastor for several years.    Several members, how many is in dispute, demanded his removal, while the officers of the church and controlling members insisted on his retention. The faction opposed to his pastorate was insistent and made complaints against him to Father Poniatishin who, as he states, "after admonishing him many times," removed Father Sterniuk from that pastorate and put him under sentence of suspension for "contumacy and disobedience."    The controlling officers and members of the church insisted on retaining Father Sterniuk and he thereafter remained for some time as their pastor in disobedience of Father Poniatishin's mandate, supported by the officers of the corporation and most of the congregation, as plaintiffs claim, denying the administrator's authority under their rights and privileges of clergy as a Greek Catholic Church to remove against their wishes a pastor who had been sent them by the Bishop of their diocese.

Early in 1917 the opposing faction began a suit in the Wayne county chancery court to restrain Father Sterniuk from performing any religious services as pastor of the church.    While that suit was pending those of that faction withdrew from participation in the affairs of the church under its duly elected officers, and formed a separate church organization, secured a site on Clippert avenue but a few blocks from the Cicotte avenue church, and in 1919 they had erected a church there, procured a pastor assigned to them by Father Poniatishin and started a rival parish of the same denomination, separately incorporated under the same act as the other, giving it the corporate name of the "Ukranian Greek Catholic Church of St. John the Baptist."    They apparently were active in securing members and pretentious church temporalities beyond their revenues until they had accumulated an indebtedness against their church of some $70,000 as admitted by them, and of $90,000 as claimed by plain-

tiffs. They in the meantime aggressively essayed to obtain possession of and title to the Cicotte avenue church property. Amongst other hostile efforts, though out of possession and separately incorporated, they assumed by some separate organization the right to represent the old corporation and in its name deeded the Cicotte avenue church property to Father Poniatishin, in trust, later mortgaging it for $7,500 most of which went to their then attorneys for fees in their extensive litigation with plaintiffs, as the latter claimed and they do not deny.

On November 19, 1919, in a suit entitled "St. John's Greek Catholic Church v. Ukranian Greek Catholic Church of St. John the Baptist," a decree was granted plaintiffs by the Wayne county circuit court, in chancery, declaring the deed to Father Poniatishin void and ordering the defendant to surrender the same for cancellation.

In a suit instituted by the Clippert church faction under the title "St. John's Greek Catholic Church v. Rev. Myron Sterniuk" a decree was rendered on February 25, 1921, restraining him from longer acting as pastor of the Cicotte avenue church or occupying its pastor's residence. It is claimed this decree was with his consent under some tentative agreement for adjustment of the trouble, but whether so or not he left the church, and Detroit, before April 1, 1921, and was later assigned to another pastorate in the diocese by Father Poniatishin. Plaintiffs' counsel there, but defendants' here, asked a writ of assistance for possession of the Cicotte church property which was refused by the court. The property was then in the possession and under control of plaintiffs as trustees of the corporation, regularly elected as such pursuant to its by-laws and so far as shown not made parties to that suit. Father Sterniuk's residence in the parsonage was only as a pastor serving the parish, subject, under the by-laws of the corporation, to removal by its

board of trustees at any time for any cause on 90 days' notice.  Its then board of trustees, including the five officers provided for in its by-laws, were the board elected in 1920, some of them having been annually elected officers of the parish for many years.

Since the hegira of those who organized the Clippert avenue church in the latter part of 1917, elections of officers had been annually held as before on a designated day in April, after proper notice as their by-laws provided.  The usual church activities of such a parish were maintained by those who remained, with regular Sunday services and other religious observances according to the Greek Catholic faith until Father Sterniuk left.  The parish was self-supporting during that time, as it always had been, they restored the church building which was partially destroyed by fire, paid the salaries of their pastor and teacher, with all other expenses of maintenance, and the corporation was then in sound financial condition as such with a membership of about 400, as plaintiffs' witnesses testified.  It was the original Ukranian Greek Catholic Church of Detroit, founded under the auspices of Bishop Ortinski to whose diocese it admittedly belonged, and who had supplied its pastors, including Father Sterniuk.  The Clippert avenue church was organized some ten years later under the administration of Father Poniatishin who in reply to a direct question said he would not assign a separate priest to the Cicotte avenue church, giving as a reason, "There is no room for two separate priests."

After refusal of the court to grant them a writ of assistance, parties affiliated with the Clippert avenue faction several times demanded of plaintiffs and unsuccessfully attempted to take possession of the Cicotte avenue church property, and on April 2, 1921, a formidable processional led by defendants' then attorney armed with a hammer, and Father Lysiak, the recognized pastor of the Clippert avenue church who

had also been designated by Father Poniatishin as pastor of the Cicotte avenue church, marched there from the Clippert avenue church and demanded possession. On being refused they invaded the premises, broke open the church door and forcibly took possession of the church property both real and personal. Those in charge were unable to successfully resist and called for police assistance. Some 16 of the invaders were arrested but were later released. Details of the assault and capture were curtailed by admission of defendants' counsel that they took possession of the property by force and had since retained it.

After breaking open the church they entered and Father Lysiak conducted some religious services there, after which he turned to temporal affairs and declared all offices of that church corporation vacant except his own as pastor, and as such proceeded to fill the so vacated offices by appointment because, as he testified,—

"the persons who claimed to act as trustees and who would not recognize me as pastor ceased to be members of that church. * * * And then I being the only remaining trustee in good standing of that church appointed trustees to fill the vacancies. That was on the 2d of April. Then the board of trustees designated a meeting, annual meeting of that church. That was the 3d of April, 1921. That meeting was held after services. At that meeting the president and board of trustees were elected."

The parties so elected at that meeting are the defendants here, and were then admittedly "attending members of the Clippert avenue church."

Father Lysiak, who served and received his salary from the Clippert avenue church, said he held services at the Cicotte avenue church also a few times after that seizure but there were not enough people coming to church on Cicotte avenue and he determined that two churches were not necessary. The only disclosed

further activity on his part in matters relating to the Cicotte avenue church trouble was a suit by him for $50,000 against Komarynski, the president of that corporation, whom he deposed at the time of the forcible seizure of its property.    After getting possession defendants dismantled that church of its equipment, removed much of its personal property and again deeded the realty to Father Poniatishin.

In justification of this summary elimination of all the elected and acting officers of that corporation at the time the property was forcibly taken from their possession by defendants, their counsel cite section 3 of article 2 of its by-laws, relating to "Members," reading as follows:

"SECTION 3. A member shall continue to be a member in good standing upon performance of all of the requirements imposed upon the members by the board of trustees and upon complying with the rules and requirements of the Greek Catholic Church.    In case of failure to comply with said requirements he shall not be entitled to any of the benefits hereinbefore mentioned and shall cease to be a member."

Article 5 of the by-laws which provides for a board of trustees to conduct the business of the corporation contains no provision that they must be "members," but assuming it to be implied, that article specifically provides:

"SECTION 6. Any member of the board of trustees or officer may be removed from office by a two-thirds vote of the board of trustees at a meeting called for that purpose, for conduct unbecoming a Greek Catholic and for a continued neglect in the performance of his duties.

"Sec. 7. Written charges against such member or officer must be filed, with the secretary at least two weeks before any action can be taken thereon and a copy of such charges must be furnished to the accused at least one week before the meeting during which action will be taken thereof."

232—Mich.—7.

We find nothing in the articles of association or by-laws of this corporation, or in the jurisprudence of this State, to sustain this summary *ipse dixit* removal of all of its apparently *de jure* and unquestionably *de facto* trustees by forceful seizure of its property from their possession, followed by a deed divesting the corporation of its title thereto.   The very by-laws to which they appeal for vindication expressly provide that all property of the corporation both real and personal "shall be in the name of the St. John's Greek Catholic Church."

This case appears to have been disposed of in the court below on the two assumptions that plaintiffs had foreclosed all right of this corporation to possession or ownership of the property it had acquired by an allegation in one of its lengthy pleadings in another case wherein it is denied that the St. John's Greek Catholic Church was under the rules and regulations of the church of Rome and alleged it was under the supervision of the Russian Greek Catholic Church, and that they had in a subsequent meeting of the opposing factions settled their differences by an agreement to abide the decisions of the administrator of the diocese

Plaintiffs deny entering into any such claimed agreement.   Their version of the transaction is that in an effort to settle the controversy they offered to freely submit it to the administrator's jurisdiction and control as a faithful parish of his diocese provided they were permitted to retain their church organization and property as a Greek Catholic Church parish served by a separate priest assigned to it by the administrator offering to give bonds to pay his salary and to be self-sustaining, which was refused them.   This offer was renewed in substance at the hearing when defendants' claim of settlement was gone into.   But even if as defendants contend, there was nevertheless no official action taken which legally affected the property rights of this corporation.

As to plaintiffs' statement in a pleading in another suit between the parties wherein it is urged they irrevocably read themselves without the pale of the Greek Catholic Church by denying its jurisdiction and alleging they were under the supervision of the Russian Greek Catholic Church, they emphatically repudiated such thought or purpose, or having intentionally subscribed to any such statement, or understanding that the lengthy writing they signed as prepared by their attorney so alleged. The attorney who drafted it also drew the bill in this case, which refers in terms of disavowal to that unfortunate allegation and explains that it "was erroneously dictated upon the misconception of the Reverend Myron Sterniuk." Plaintiffs positively testify that they were and are true adherents of the Greek Catholic Church in religious belief, observances and confession of faith, recognizing themselves and their church organization as belonging to and under the jurisdiction and control of the diocese of that denomination in which they are located in all spiritual and ecclesiastical matters, their only offense, if such, being in supporting their pastor who had been assigned to them by the bishop of their diocese, in contesting the authority of the administrator to remove him. As he has since been assigned to another pastorate of that faith, such "contumacy and disobedience," does not seem to be necessarily counted an unpardonable sin.

In matters of church polity purely ecclesiastical civil courts do not interfere, but when property rights are involved they are to be tested in the civil courts by the civil laws. As presented here this religious feud has been so manipulated and litigated as to be decidedly of the world worldly, being in effect an attempt by one church corporation to obliterate another of the same faith and denomination, which in church governmental polity may possibly involve something of ecclesiastical

import, and to also assimilate its temporalities by a forceful seizure of its corporate property, which is decidedly a matter for the civil courts to deal with.

"When civil rights or property are involved the civil courts will insist that an accusation be made, that a notice may be given, and an opportunity to produce witnesses and defense be afforded, before they will give effect to an expulsion or suspension of the kind here attempted. Hoffman, Ecclesiastical Laws, 276. *West Koshkonong Congregation* v. *Ottesen,* 80 Wis. 62 (49 N. W. 24)." *Russian Orthodox All Saints Church* v. *Darin,* 222 Mich. 35.

This ill-advised seizure of plaintiffs' property by force was without color of civil law, and the subsequent pretended election of trustees of that corporation was in violation of its charter and, from every legal point of view, a nullity.

The relief asked as to title to realty is indirectly against those not made parties to this suit and cannot be considered, but as between the parties to this suit plaintiffs are entitled to the injunctive relief asked restraining defendants, their successors or substitutes from assuming to act as trustees of the St. John's Greek Catholic Church, from withholding from the possession of plaintiffs or interfering with them in the management and control of its corporate property, both real and personal, including the seal, books and records of said corporation. Plaintiffs' claim for an accounting is not properly presented either in pleadings or proofs and is dismissed without prejudice.

The decree heretofore entered herein is reversed, with costs to plaintiffs.

MCDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.