Smith *et al. v.* Pedigo *et al.*

---

SMITH ET AL. *v.* PEDIGO ET AL.

[No. 16,477.   Filed March 15, 1893.   Rehearing denied June 17, 1896.]

RELIGIOUS SOCIETIES.—*Religious Freedom.—Right of Church Member.*—The provision of the Federal constitution declaring that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," and of the State constitution that "All men shall be secured in their natural right to worship God according to the dictates of their own conscience," do not give to a church-member the right, after he has repudiated the faith and doctrine upon which his church was founded, to exercise and enjoy the benefits and privileges of a member of such church, contrary to the rules and laws upon which such church was established. *p. 365.*

SAME.—*Church.—Rules of Decorum.—Change in Articles of Faith.*—Where a church requires of its members that they all subscribe or assent to its articles of faith, a rule of decorum providing that all questions coming before the church shall be disposed of by a ma-

jority, except as to the reception of members and the appointment of officers. which shall be by unanimous vote, does not authorize a change in the articles of faith by a majority.    *p. 378.*

SAME.—*Baptist Association.—Church Doctrine.—Evidence.*—Though an organization of Baptist churches, known as an "association," has only advisory power as to questions that may arise in the individual churches comprising the association, yet if two factions of one of the churches, each claiming to be the true church, present their claims to such association, its decision, while not conclusive on the courts, is entitled to very great weight.    *p. 385.*

SAME.—*Ecclesiastical Law.—Jurisdiction of Civil Courts.*—The courts of this State have no ecclesiastical jurisdiction, and will not decide questions of ecclesiastical law, except where such law becomes a fact upon which the property-rights of religious societies, corporations, or churches depend.    *p. 375.*

SAME.— *Church.— Factions.—Property-rights.*—Where the membership of a church is divided into two factions, each claiming to be the church, the title to the church property is in that faction, even though it be the minority, which is acting in harmony with the doctrines and practices which were accepted and adopted by the church before the division took place.    *p. 390*

SAME.—*Church.—Factions.—Expulsion of Members who Adhere to Original Faith.—Property-rights.*—Where the membership of a church is divided into two factions, the expulsion by the majority of the members of the minority, who still adhere to the original faith, does not affect the rights of such minority to the church property.    *p. 412.*

EVIDENCE.—*Judicial Notice.—Historical Facts.*—The court may take judicial notice of historical facts.    *p. 412.*

SAME.—*Articles of Faith Cannot be Contradicted by Parol.* — The articles of faith of a church being a solemn written compact, are conclusive on the question of faith, and cannot be contradicted by parol evidence.    *p. 420.*

PLEADING.—*Answer.—Abatement.*—An answer which pleads matter in abatement, along with matter in bar, and asks judgment on the merits, thereby waives the matter in abatement.    *p. 323.*

From the Boone Circuit Court. ` *Reversed.*

*W. E. Niblack, C. S. Wesner, T. W. Lockhart,* and *A. C. Harris,* for appellants.

*Terhune & Higgins,* for appellees.

McCABE, J.—This was an action for the recovery of the possession of real estate, in the ordinary form

under the code, brought by appellants against the appellees. A change was taken from the court, and the special judge called to try the case first, the Hon. Ralph Hill, made a special finding of the facts and stated conclusions of law, upon which judgment of recovery of the possession in favor of appellants followed. A new trial, as a matter of right under the statute, was granted to the appellees. That special judge declining to hear the case again, the Hon. William M. Franklin was called and tried the case again without a jury. He found generally for the defendants, the appellees, and, over a motion for a new trial, rendered judgment for appellees, the defendants below. The only error assigned here is the overruling the motion for a new trial. The grounds of that motion are, that the finding of the court is not supported by, and is contrary to the evidence and the law.

The real estate sought to be recovered in the action, is a church building, erected on the land described in the complaint for, and was used as a house of worship unitedly by the Mount Tabor Regular Baptist Church, of Boone county, Indiana, from a time when the building was erected, shortly after the date of the deed conveying the land to her trustees named, and their successors in office, for the use of said church, on June 30, 1857, until the summer of 1889, when a division took place in the congregation, on account of a difference in belief between the two factions on points of doctrine and practice. Ever since the last named date, each of these factions has been claiming to be the only Mount Tabor Regular Baptist Church; the appellants being the trustees lawfully elected by the minority faction, and the appellees being the trustees elected by the majority. This state of affairs renders it incumbent on the court to ascertain from the evidence, if we can, which one of these factions

represents, and is the real and true Mount Tabor
Regular Baptist Church, if either one is. This involves
an inquiry into certain religious doctrines and prac-
tices of that church, as a religious society or body. Not
because the law which we are to declare recognizes any
particular form of doctrine or faith and practice as
the true one, nor because the law requires any form of
doctrine or religious belief from anyone, or from any
society or church whatever; but because, in a case of a
divided congregation of a church or religious society
on account of a difference of religious belief, faith,
and practice between the disagreeing divisions, it may
become necessary, where there is a dispute as to the
title to the church property, to inquire which faction,
or division, still adheres to the original faith and doc-
trine, rules and laws upon which the church was
founded, if either does, and which one has departed
therefrom, if either has; these religious doctrines,
faith, and practices, rules and laws, on which the par-
ticular church was founded, and the present faith and
beliefs of the contending factions, are listened to by
the court, not for the purpose of arriving at funda-
mental or ultimate religious truth, or for the purpose
of learning about our true relation to the supposed
author of our being, or what our state is to be after
this life; but these religious doctrines and practices
are listened to by the court solely as facts, upon which
civil rights, and rights to property are made to de-
pend, regardless of the ultimate truth or soundness
of such doctrines, practices, and beliefs. Indeed, ever
since the complete separation of church and state, in
the crowning glory of civil government among men,
by the constitution of the United States, declaring that
"Congress shall make no law respecting an establish-
ment of religion, or prohibiting the free exercise
thereof," which was followed by similar provisions in

Smith *et al. v.* Pedigo *et al.*

most of the state constitutions, and especially our own, the law has known no religious creed, no religious opinion, no religious doctrine, no standard of belief, in matters pertaining to religion. Our State Constitution, framed by wise men, and adopted by the people, has still more securely placed us out of the reach of those fierce and bloody struggles arising out of a difference in religious opinion in former times, by declaring that "All men shall be secured in their natural right to worship Almighty God according to the dictates of their own consciences," and that "No law shall in any case whatever control the free exercise and enjoyment of religious opinions, or interfere with the rights of conscience," and that "No preference shall be given by law to any creed, religious society or mode of worship; and no man shall be compelled to attend, erect, or support any place of worship, or to maintain any ministry, against his consent," and that "No religious test shall be required as a qualification for any office of trust or profit."

These provisions of the fundamental law not only take away all power of the State to interfere with religious beliefs, but they leave the citizen perfectly free to repudiate the faith and belief he once professed, and adhere to and adopt a new creed and faith differing from that of the church to which he belongs, or he may repudiate his old belief and faith without adopting any new one, and these changes he may adopt as often as to him may seem proper, and the law will protect him in it. In other words, the law allows every one to believe as he pleases, and practice that belief so long as that practice does not interfere with the equal rights of others.

But that is a very different thing from the claim of a right of a church member to repudiate the faith and doctrine upon which his church was founded, and at

the same time insist on his right to exercise and enjoy the benefits and privileges of a member of such church, contrary to the rules and laws upon which such church is established.

The main contention of the appellees is that they represent the majority of the members of the church that belonged thereto at the time that the division took place, and that the acts, rules and orders adopted by them in the regular course of church business are the acts of Mount Tabor Regular Baptist Church, and therefore binding on all members, both majority and minority, whether those acts were in accord with the laws, usages, practice, faith, and belief upon which the church was originally founded or not.

In other words, their contention substantially amounts to this : that the acts of the majority, done in the regular course of church business, is the law of the church, no matter how great the departure from the original faith and law upon which the church is founded.

While the appellants contend that the acts of the majority, though done in the regular course of church business, but in violation of the laws, usages, faith, and principles upon which the church was founded, and over the protest and objection of the minority, are not binding on anybody, and are not the acts of the church.

We have read the evidence, which is very voluminous, consisting of over six hundred printed pages, and find that there is no substantial conflict on any material point in the case.

This church was organized on the third Saturday of July, 1835, and it then adopted articles of faith, which read as follows, to-wit:

"A declaration of the faith and practice of the church of Jesus Christ, called Mount Tabor. Having

been enabled, through Divine grace, to give up our-
selves to the Lord, and likewise to one another, by the
will of God we count it a duty incumbent upon us to
make a declaration of our faith and practice to the
honor of Christ and to the glory of His name, know-
ing that with the heart man believes unto righteous-
ness, so with the mouth confession is made unto sal-
vation.

"First. We believe in one only true and living God,
and that there are three that bear record in heaven,
the Father, the Son, and Holy Ghost, and that these
three are one.

"Second. We believe that the Scriptures of the Old
and New Testament to be of Divine authority, and
the only infallible rule of faith and practice.

"Third. We believe in the fall of man, and that all
of Adam's posterity are sinners by nature, and that
they have neither will nor power to save themselves
from their tempted and sinful state by their ability
which they possess by nature.

"Fourth. We believe in the election by grace, ac-
cording as He has chosen us in Him before the founda-
tion of the world, that we should be holy and without
blame before Him, in love, having predestinated us
to the adoption of children by Jesus Christ to crown
us according to the good pleasure of His will.

"Fifth. We believe that sinners are justified by the
righteousness of God, which is in Jesus Christ im-
puted to them by Divine and supernatural operation
of the spirit of God, and that they are kept by the
power of God through faith unto salvation.

"Sixth. We believe that baptism and the Lord's sup-
per are ordinances of Jesus Christ, appointed in His
church, and none but true believers are fit subjects for
either; and that the proper mode of baptism is im-
mersion.

"Seventh. We believe that no minister has a right to administer those ordinances only such as have been regularly baptized and come under the interposition of the hands of a presbytery by the authority of the church of Jesus Christ.

"Eighth. We believe in the resurrection of the body, both of the just and the unjust, but everyone in his own order; they that have done good to the resurrection of life, and they that have done evil to the resurrection of damnation; and that God has appointed a day in which He will judge the world in righteousness by Jesus Christ, and that the joys of the righteous will be eternal, and the punishment of the wicked everlasting.

"Ninth. All of which doctrines are contained in the Old and New Testament, and we do agree sincerely to practice and maintain them to the glory and honor of the Lord Jesus Christ, and to the mutual peace and comfort of one another."

And the church adopted at the next meeting in August of that year the following rules of decorum, to-wit:

"First. It shall be the duty of the church to appoint a moderator, and it shall be the duty of the moderator, when appointed by the church, to open the meeting by singing and prayer, at least by prayer; give time and opportunity for any business that may come before the church; keep order and reprove the unruly.

"Second. It shall further be the duty of the moderator to notify the brethren of sister churches that may visit us to sit with us; and who so notified shall be at liberty to give their views on any question that may come before the church, but not to vote on the decision.

"Third. To open a door for the reception of mem-

Smith *et al.* v. Pedigo *et al.*

bers in the church; to give time and opportunity for matters and dealings that may be in gospel order.

"Fifth.   To give time for reference, giving preference to matters touching fellowship.

"Sixth.   It shall be the duty of a member, when he wishes to speak to any question, first to rise from his seat and address the moderator in a Christian-like manner; and when speaking, if he shall wander from the subject, it shall be the duty of the moderator to call him to order; and when called to order, he shall immediately sit down, unless suffered to explain himself by the church.

"Seventh.   No brother shall speak more than twice to any question without leave from the church.

"Eighth.   No motion shall be taken up in the church without first being seconded.

"Ninth.   All questions coming before the church in order, shall be taken up and determined by a majority, except the reception of members in the church and appointing officers, which shall be by unanimity, except there be but two objectors.   In that case, the objectors will let their objections be known, and then, if the church think them to be trifling and unfounded, they may act as if there were no objections.

"Tenth.   We declare an unfellowship with all benevolent institutions designed for religious purposes; that is to say, Sunday and theological schools, Baptist conventions, temperance societies, foreign and home mission societies.

"Eleventh.   It shall be the duty of the clerk of this church to keep a record of all proceedings of this church in a book provided by the church for that purpose, and sign the orders of the church; and also to keep a list of the names of members in the church separate from any other business of the church."

The evidence shows that all "Regular" Baptist churches in the United States are founded on substantially the same articles of faith and rules of decorum as those copied above, upon which Mount Tabor Regular Baptist Church was founded, and that these written documents are treated by all such churches as their constitution and law of their existence. The evidence further shows, without any contradiction, that the government of these churches is congregational in form, and that each church is the governing power for itself. The evidence also in like manner shows that the only other ecclesiastical body connected with these local churches is what is called the association and the council of the Regular Baptist churches. The association is an annual meeting, composed of messengers carrying a letter from each church belonging to the association, which letter generally gives some expression of the continued adherence of the church to their articles of faith, a detailed account of the condition of the church, its progress, travels, trials, and troubles, if any, since the last meeting of the association; which letter constitutes the credentials of such messengers upon which they are either admitted to seats in the association as representatives of the particular local church named in the letter, with power to vote on all questions coming before the association, or they are refused such seats, as to the association shall seem proper, according to the laws, usages, and practices of the Regular Baptist churches and their associations.

The Mount Tabor Regular Baptist Church joined, and became a member of what is known as the Danville association. This association was organized in 1853. Those parts of its constitution material to the question here involved are as follows, to-wit:

"1. The association shall be established on the

principles of the union, and shall be composed of members chosen by the different churches and sent to represent them in the association, who, upon producing letters certifying their appointment, shall be entitled to a seat.

"2. The letters from the different churches shall be expressive of their situation, together with their days of their church meetings.

"3. The members thus chosen and convened shall be denominated the 'Danville Association,' but shall not have power to lord it over God's heritage so as to infringe on any of the internal rights of the churches. Nevertheless, we agree that the churches composing this association shall stand in the same relation to each other in the association as the individual members in churches do to each other, viz: If one church trespass against a sister church she shall be dealt with according to the directions given in the 18th chapter of St. Matthew, and other scriptures which respect discipline; and if she cannot be regained, shall be dropped from the union, and the association will not take cognizance of any case of the above kind unless the above proceedings shall have been had thereon."

Section 5 provides for a moderator and clerk, to be chosen by the members, to continue in office until the letters of the next association are read and the names of their messengers enrolled, and in case of a failure of the moderator, the clerk shall nominate one to act; and in case of the failure of the clerk, the moderator shall nominate one to act. Section 6 provides that the moderator shall keep order, state all questions fairly, collect the suffrages of the churches, etc., and vote only in case of a tie. Section 7 provides for the keeping of a record by the clerk of the proceedings.

"8. It shall be the duty of any church wishing to

join the association, to apply by letter and messengers, to state their faith and by whom constituted, unless it be a church dismissed by letter from a sister association in our union.

"9. Any association wishing to correspond with this association must express her faith in her letter, and if not objected to, shall be received, and when received, her messengers shall be entitled to a seat in council.

"10. All queries laid before the association shall be first debated in the church where it originated, and if they cannot decide on it, they shall insert it in their letter. * * * * *

"12. The association shall give advice to the churches in matters of difficulty." * * * * Section 17 provides that by a two-thirds vote this plan of government may be amended.

The evidence shows that twenty-two churches compose the Danville Association, and did so at the time the division took place in Mount Tabor Church, and are still members of that association. The council is a body of messengers or representatives of a number of sister churches, generally belonging to the same association, that may be called by a church wherein internal difficulty has arisen in such church where such church is unable to settle the difficulty herself.

The difficulty which resulted in the unfortunate division of Mount Tabor Church, arose out of a difference of opinion and belief as to a certain doctrinal point which sprang up between the members shortly previous to the division. That difference related to the "means" by which sinners are to be made Christians. The majority, represented by appellees, believe in the use of "means" for that purpose, while the minority, represented by the appellants, do not believe in the use of means for that purpose. And thus they became

designated as the "means" party and the "anti-means" party. The difference between the two beliefs upon that point is aptly explained by the two leading witnesses, one on behalf of appellants, and the other on behalf of appellees. Elder Shirley, on behalf of appellees, stated that "The anti-means brethren believe that sinners are regenerated by personal contact with the Holy Spirit; that persons are regenerated without means or any instruments whatever; that it is the sole original work of the Holy Spirit. While the means believe the work of regeneration, the power of quickening, is, in every sense, by the Holy Spirit, yet, that God uses the ministry of the gospel and Christian service and prayers and intercessions, as a means of leading sinners to Christ; and hence, that they are quickened, being penitent of their sins, by the Holy Spirit and the life that comes from God. The anti-means party declare that just as many sinners of Adam's race and of the different nations would be saved if there never had been a Bible written or a sermon preached. While the means party believe that ministers are now working under the original commission that Christ gave the apostles, and that it is God's wish and God's plan that the gospel shall be preached,  *  *  and He has promised He will go with them to bless the word preached for the regeneration of sinners and the upbuilding of the church of Christ."

Elder E. D. Thomas, on behalf of appellants, testified as to the difference as follows, to-wit: "When simmered down to its finest point, one party believes that the Holy Spirit acts independently, directly, and through no communication whatever except the immediate contact with the life-giving spirit given to the sinner's heart. The other party believes that God does sometimes communicate the same life-giving power in some other way than directly and abstractly.

I never limit Jehovah  *  *  let Him do just as He pleases.  *  *  *  But I don't believe He needs any vehicle to convey His spirit.  *  *  But when persons take the position that God has to have the gospel as a vehicle, or He has to have the gospel, or something else, as a means in order to get to the sinner, then it is seriously objected to  *  *  *  by the anti-means party;  *  *  *  as the thief on the cross  *  *  * there was no gospel there at all, yet God quickened and saved him."

There is no conflict in the evidence that the foregoing statements truly represent the substantial and real difference in doctrine between the majority and minority divisions of Mount Tabor Church.  It is true, there was some evidence tending to show that the doctrine of the means party leads to the fostering of Sunday schools and missions by the majority, but there was some conflict on those points, and we cannot weigh the testimony so as to disturb the finding of the court on any point where there is a conflict of evidence.  There is no dispute between the parties that the foregoing difference of opinion existed in the church, and led to, and was the cause of the division; it is also conceded that the evidence shows that this difference in belief arose a short time before the division; and appellees' counsel contend that the above defined belief of the majority was the original belief and faith of the church on that point, and that the above defined belief of the minority was new, an innovation, and a, departure from the original faith of the church.  But all the evidence tends to prove, without a conflict, directly to the reverse of this contention.  The articles of faith, which the evidence shows, are subscribed or agreed to by each member in the church, would amply warrant us, were it a secular document, in holding that

the above defined belief of the minority, represented by appellants, was the original belief and faith of Mount Tabor Church, and that the above defined belief of the majority, represented by appellees, was an innovation and a departure therefrom.

While the courts of this State have no ecclesiastical jurisdiction whatever, yet they are charged with the duty and clothed with the jurisdiction of protecting property-rights of religious societies, corporations and churches, as well as that of individuals, and thereby, of necessity, they may be compelled to decide a question of ecclesiastical law when that law becomes a fact upon which property-rights depend. They ought not, however, to be inclined to "Rush in where angels fear to tread," and where necessity does not compel them.

In *Roshi's Appeal*, 69 Pa. St. 462, it was said: "That it is the duty of the court to decide in favor of those, whether a minority or majority of the congregation, who are adhering to the doctrine professed by the congregation, and the form of worship in practice, as also in favor of the government of the church in operation, with which it was connected at the time the trust was declared." * * *

"The title to the church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs and principles which were accepted among them before the dispute began, are the standard for determining which party is right." These quotations from the case named are but quotations from previous cases, a long line of which, both English and American, are cited in that case. That case has been so frequently quoted with approval by American courts of last resort on questions of this kind, that the principles announced therein may be regarded as settled law in

this country. This court, in the case of *White Lick Quar. Meet. of Friends, et al.* v. *Same,* 89 Ind. 136, quoted from that case with approval, the same we now quote, but the quotation was not so applicable to that case as it is to this.

The controversy in *Roshi's Appeal, supra,* as here, was between two factions of a divided congregation over the title to the house of worship and the ground upon which it was situated; and there, as here, the church was organized in 1835. The lot was afterwards conveyed by the owner to three named "trustees of the German Reformed Church, in trust for the use of the said German Reformed Church." The house was erected afterwards. The lot here in question was conveyed by the owner on the 12th day of October, 1857, to three named "trustees of the Mount Tabor Regular Baptist Church of Jesus Christ, in Boone county, for the use of said church, for the sum of $75.00." The house was afterwards built on it by the church. The court, in the case quoted from, further said, in relation to the title deed in that case, equally pertinent to this, that "a religious society, incorporated or unincorporated, is but the trustee of a charity, and it has always been peculiarly within the province and duty of a court of equity to prevent the diversion of property, held in trust for such purposes, from the object and design of the original endowment. * * * * Whenever a church or religious society has been originally endowed in connection with, or subordination to, some ecclesiastical organization and form of church government, it can no more unite with some other organization, or become independent, than it can renounce its faith or doctrine and adopt others. * * * It was *ultra vires.* They might, indeed, as individuals, have formed any kind of church they pleased, independent or connected with any other

ecclesiastical organization. The land was before them, but then they must cease to be a German Reformed Church, and abandon all claim of right to hold any of the property of that church. It was a part of their religious liberty, guaranteed to them by the constitution of the Commonwealth, to separate from their former association, if they became dissatisfied with its faith or order, and build for themselves another church and organize on other principles; but it was no part of that liberty to appropriate to themselves, in their new capacity, property which had been solemnly consecrated to other uses. * * * To this question there can be but one answer in law, equity, good conscience, justice as well to the living as to the dead." The court adjudged that the minority were acting in harmony with the law of the church, and that they were entitled to the property. These principles were recognized and reaffirmed by this court in the late case of *Lamb, et al. .v. Cain, et al.,* 129 Ind. 486, where it is said, that, "there is no doubt that a person owning property in his own right may dedicate such property, by way of trust, to support and propagate any definite doctrines or principles, provided it does not violate any law of morality, and sufficiently expresses in the instrument by which the dedication is made the object of the trust. In such cases it is the duty of the courts, in a case properly made, to see that the property so dedicated is not diverted from the trust attaching to it, and so long as there are persons in interest, standing in such a relation to the property as that they have a right to direct its control, they may prevent the diversion of the property to any use different from that intended by the donor. If such trust is confided to a religious denomination or congregation it is not in the power of a majority of that de-

nomination or congregation, however large the majority may be, by reason of a change of religious views, to carry the property thus dedicated to a new and different doctrine." The particular doctrine, practice, and faith of Mount Tabor Regular Baptist Church, as expressed in their articles of faith and rules of decorum, had been long established, and were well known and regarded by all as the law of the church when the deed in this case was made conveying the lot to the three trustees named, for the use of said church. We, therefore, do not think it was in the power of the majority, by reason of a change of religious views, to carry the property thus dedicated to a new and different doctrine.

But counsel for appellees, as before observed, have mainly relied on the rules of decorum to justify the action of the majority. The 9th section thereof, as we have before seen, provides that "all questions coming before the church in order shall be taken up and determined by a majority, except the reception of members in the church and appointing officers, which shall be by unanimity, except that there be but two objectors. In that case, the objectors will let their objection be known, and then, if the church thinks them to be trifling and unfounded, they may act as if there were no objections." This rule cannot be held to authorize a change of faith and practice by a vote of the majority, as contended. The evidence shows that all members, according to the usages and practice of the Regular Baptist Churches, are expected to either subscribe or assent to the articles of faith, or be in harmony therewith, in faith and belief. Hence, the propriety of the exception to the right of the majority to rule, in case of receiving members into the church. If the candidate does not give satisfactory evidence that he is in harmony with the articles of faith, the

fundamental law of the church, in his faith and belief the majority cannot carry him into the church and make him a member. If the majority cannot admit one who does not believe or acquiesce in the articles of faith, then it would be equally true that the majority have no power to change the faith of the church against the objection or protest of the minority. As well might it be contended that a banking corporation or association, by a majority vote of its stockholders or directors, could change its business from banking to insurance business, or into that of a railroad company against the protest of the minority, and *vice versa.*

But if we had any doubt as to the correctness of our construction of the fundamental law of this church, contained in the articles of faith and rules of decorum, that doubt would be entirely cleared away by the action of the Danville Association, to which this church belonged, and the action of two councils, to each of which these very troubles were submitted.

In 1889 both factions claiming to be the church, sent a letter and messengers to the association. These letters were both returned to the senders, requesting and advising them to become reconciled; the minority then, in accordance with Baptist practice, usages and custom, requested the majority to join them in calling a council from sister churches, which the majority declined to do. The minority called a council, consisting of messengers, or representatives, from seven sister churches; that council met, the minority appeared before them and requested the majority to do the same, but they declined. The council heard the evidence in support of the charge that the majority had departed from the faith, and other matters, and found the charge true, which was reported back to the churches sending the members of the council.

The majority paid no attention to these things, further than to exclude the minority from the church because of these proceedings. Before the next association met, another council was called from a majority of the churches composing the association, an unavailing request having been made of the majority by the minority to take part in it, which they declined. That council also heard the evidence in support of the charge against the majority, and it also decided that the charge of departure from the faith, contained in the articles of faith, was established against the majority, and that the minority was the true Mount Tabor Church, walking in gospel order. And they recommend to sister churches to recognize the minority as the Mount Tabor Church.

Both parties again sent letters and messengers to the next meeting of the Danville Association in 1890, the majority and the minority, each claiming to be the only true Mount Tabor Church, and each inserting in its letter, its respective version of the controversy. The association unanimously received the letter from the minority, and admitted her messengers to seats in the association, as the representatives of the only true Mount Tabor Church, and recommended that sister churches of their faith and order should recognize the minority as the true Mount Tabor Church. And the association refused to receive the letter of the majority, though it was read and discussed, and refused to admit the messengers of the majority to seats in the association. This action was on the ground that the majority was guilty of a departure from the faith expressed in the articles of faith.

In *White Lick Quar. Meet. of Friends* v. *Same, supra,* this court said: "The civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions, and of all matters

which concern the doctrines and discipline of the respective religious denominations to which they belong." Therefore, we feel doubly assured that the decision we reach on the question of doctrine and departure from faith by the majority is correct, since three several ecclesiastical tribunals of this church have so construed the articles of faith, rules of decorum, and the doctrine believed and practiced by the majority.

But it is contended that the decisions of these ecclesiastical courts, the councils and the association, is not binding on anybody, much less that they are binding on the civil courts. This extraordinary position is earnestly and, we may say, even ably contended for, on the ground that the Regular Baptist Church government, being congregational, and therefore independent of any higher judicatory than the local church itself, and the powers of the council and the association; if the particular church concerned, or majority thereof, sees fit not to take the advice of the association, that such majority may go on as they please. It must be conceded that the evidence shows that the power of the association is only advisory, and the same is true of the council; the association, however, as shown by the evidence, has plenary power where two sets of messengers, with separate letters from each of two factions into which a church is divided, and each claiming to represent the true church, to authoritatively declare which is the true church, by the reception of one of these letters and by the admission of the messengers of that one to seats in the association. But it is earnestly contended that by the church polity and government of the Regular Baptist denomination, as shown by the evidence, a church may withdraw from an association and still continue to be a Regular Baptist church, with all powers it had before

it joined the association, and hence the refusal of the association to receive the letter and messengers sent by the majority, amounted only to a withdrawal of Mount Tabor Church from the Danville Association. The majority were not seeking a withdrawal, but recognition as the only true Mount Tabor Church, and admission to seats as such by her messengers in the Danville Association. Defeated in that, they turn around and say the Danville Association had no power to enforce her decisions, and they assume to withdraw Mount Tabor Church from the Danville Association, and they organize a new association and join it, called Mount Tabor Association. But they are foiled in that, because, from the records of the Danville Association, shown in evidence, it appears that Mount Tabor Church is still a member of the Danville Association. While the evidence clearly shows that by the laws, rules, usages and practices of the Regular Baptist churches, a church may withdraw from an association without destroying its identity as such, and without disorganizing its self-existent government, yet there was not a particle of evidence to show that a part or faction of a church might do so.

Appellants' contention amounts to this: that the majority may rule over the minority with a high hand in violation of the laws, rules, usages, faith and practice upon which the church is founded, and on appeal by both parties to the association for its approval, advice and recognition, the majority receiving therefrom an unfavorable decision, may turn around, deny the power of the association to deal with the matter, go back home and oppress the minority by going through the form of excluding them from the church, withdraw from the association, organize a new one and join it; and thereupon claim the right to be heard to say in the civil courts that because the Danville As-

sociation had no power to enforce its decision and decree, that the civil courts, therefore, are powerless to protect a title to property, dependent upon that ecclesiastical decision and decree. According to the code of morals which the civil law requires us to uphold in all cases, the majority are estopped from such a contention. If their contention were to prevail, the civil courts would find themselves recognizing one faction of a divided church as the true church, while the ecclesiastical courts of that denomination would be recognizing the other faction as the true church. In other words, appellants' contention requires us to hold that the faction of Mount Tabor Church known as the majority, is the true Mount Tabor Church, while the undisputed evidence shows that all the ecclesiastical courts of that denomination, outside of that faction itself, has recognized the other faction, the minority, as the only true Mount Tabor Church. Such a contention has never been upheld by the decision of any court of last resort that we have been able to find, either in America or England, and our duty forbids us to be first to set the example.

But suppose we treat the action of the association as purely advisory and not judicatory, still its action must have a controlling influence on the civil courts. The Supreme Court of the United States, in a case, in some of its aspects much like the present, said: "They claimed to be the Third Colored Baptist Church, and as such they were recognized by councils of Baptist churches, duly called, and by the Philadelphia Baptist Association, an ecclesiastical body with which the church was associated. That body, it is true, was not a judicatory. Its action was not conclusive of any rights. But the fact that the complainants, and those acting with them applied for recognition as the Third Colored Baptist Church, and that the associa-

tion thus recognized them, is persuasive evidence that they were not seceders, and that their rights have not been forfeited." *Bouldin* v. *Alexander*, 15 Wall. 131.

The undisputed evidence shows that the form of church government in the different denominations of Baptists in the United States is substantially the same.

On the question of the weight to be given to the decision of the Danville Association, we find a very pertinent case, decided by the Supreme Court of Ohio. *Harrison* v. *Hoyle*, 24 O. St. 254. That court said: "According to the rules of the society, we think the question of succession in the Ohio Yearly Meeting was a proper subject for the consideration and judgment of other yearly meetings. And it is quite certain that both parties so understood the polity of the society at the time of the separation, as each submitted to the several other yearly meetings its claim for recognition as the only true and legitimate Ohio Yearly Meeting. The several meetings then in existence (save only Philadelphia, in which there was a divided sentiment) decided in favor of Binns and his associates, upon full consideration of all the facts involved in the controversy. Are these decisions entitled to consideration and weight in this case? * * The civil courts, in determining the question of legitimate succession, in cases where a separation has taken place in a voluntary religious society, will adopt its rules, and will enforce its polity in the spirit and to the effect for which it was designed. * * * * Applying these principles to the facts of the case before us, we are of opinion that the decisions of the several yearly meetings of the society, in relation to the succession in the Ohio Yearly Meeting, are proper and legitimate evidence in the case, and are entitled to great weight as intelligent opinions and judgments

upon the subject. And when considered in connection with the circumstances of the separation, and in view of the principles upon which the Ohio Yearly Meeting was organized, they satisfactorily show that the meeting over which Binns presided affiliated with the undoubted regular women's meeting, was and is the true 'Ohio Yearly Meeting of the Society of Friends,' within the terms and meaning of the grant, whereby the trust estate in controversy was created." This case was cited with approval by this court in *White Lick Quar. Meet. of Friends* v. *Same, supra.*

We therefore conclude that even though the Danville Association had nothing but advisory power in the matter, yet, as both parties submitted their claims to it, on their own statement and version of the controversy, seeking its recognition, the decision of the association is entitled to very . great weight as to which faction is the real and true Mount Tabor Church, and while not conclusive upon the courts, its decision, composed as it was of delegates, called messengers, from the whole twenty-two churches composing the association, a majority of whom, in council, had decided the same way, would be a safer guide for the civil courts on questions of religious doctrine, discipline, faith, and practice, than any judgment we might form contrary thereto.

In a recent case, the Supreme Court of Iowa has decided almost every single point here involved, where the minority of a divided Baptist Church was held to be the true church. *Mount Zion Baptist Church, et al.* v. *Whitmore, et al.,* 83 Ia. 138. The point there involved, and the contentions were so similar to those in this case, that we are induced to quote from the very able opinion in that case. That court said: "The petition recited the substance of the foregoing [which was a

narration of the church troubles and the calling of a council and its decision], and contains averments that the defendants, and those associated with them, have departed from the faith and practice of the Baptist church, and are using the church building and records for the benefit and promotion of doctrines and faith contrary to and in violation of the faith, covenants and practice of the Baptist denominations, to maintain which the church was organized and the buildings erected. The relief sought is, that the defendants be restrained from interfering with the plaintiff in the free use of the church buildings and property for their legitimate use as a place of worship, and teaching the doctrines of the denomination. The answer puts in issue the allegations of the petition. * * * * The council found the doctrine of 'entire sanctification,' as taught by Smith brothers, was 'not in harmony with the teachings of the Baptist denomination,' but 'subversive to the very end sought,' and 'destructive of the peace' of the churches. The correctness of this doctrine as a rule of faith and observance in the Baptist church was in dispute between the factions. It was not, as indicated by appellees' argument, a question of the truth or falsity of the doctrine on Scriptural authority, but was it in accord with, or subversive of, the covenants and practice of the Baptist church, with the limitations imposed by its articles of association. This was a purely theological question, and a council of theologians from that church was a proper tribunal to determine such a question, and was so recognized and agreed upon by the parties. It is, however, contended by the appellees that they are not bound by this finding of the council, and we notice their reasons, or at least some of them. Much stress is laid upon the fact that each Baptist society is an independent body, with no higher eccle-

siastical authority for its control; that its form of government is congregational where a majority govern; and that it is within itself 'a little republic.' It should be borne in mind that it is the distinctive character of the Baptist church government that is relied upon to make it an exception, and free it from the generally expressed rule of law, by which a minority of an association may claim its property against a majority seeking to divert it from its legitimate use. A quotation from the appellees'argument will indicate clearly the objection to be met. It is said: 'Yes, we repeat again if this church or any other Baptist church desires to change its "articles of faith" or belief, it may do so, if a majority of its members concur therein. If it desires to change to a Mormon church it may do so, and no person or persons, no man or body of men, either civil or ecclesiastical, has any right to interfere. It owes no allegiance to any man, or body of men, except a majority of its own members. It has no creed except the Bible, and the right of its own members to interpret that according to the dictates of their own consciences. If a majority of the members of that church believe the Bible to teach a certain doctrine, then that is "Baptist doctrine," because that church has the right and the power to determine for itself what the Bible teaches, and no other church or churches has any right to interfere therein.' The Baptist as a denomination, have no creed. There is no such thing as a one Baptist church with a one Baptist creed or belief. All there is of "Baptist creed" consists in the right of each separate church to interpret the Scriptures for itself, and to say for itself what it believes the Scriptures to teach. There are as many "Baptist churches" as there are several societies or congregations. There are as many "Baptist denominations or creeds" as there are several societies or con-

gregations which have given expression to their belief
of what the Scriptures teach.' Afterwards follows
the conclusion: 'We conclude, then, if there be a
difference of opinion between the plaintiffs and de-
fendants as to what the Bible teaches with refer-
ence to sanctification, and the defendants are in a
majority and plaintiffs a minority, according to
Baptist practice and usage, there is but one remedy,
namely, "they may retire, and find a home in some
other church; or, they may organize themselves into
a new one." ' " The court then goes on to say: "This
exclusiveness of government within the strict lines of
ecclesiastical authority may be conceded; but we are
constrained to doubt that any writer, either upon
ecclesiastical or civil law, where a controversy in-
volved the right of a minority of an association to
have its property devoted to the purpose for which it
was given or granted, has laid down a rule so broad.
* * * We are not adjudicating the right of any per-
son to a religious belief or practice, nor are we to de-
termine the truth or falsity of the doctrine of 'sancti-
fication,' or 'sinless perfection.' Upon authority so
general as to be beyond question it is held that prop-
erty given or set apart to a church or religious asso-
ciation, for its use in the enjoyment and promulgation
of its adopted faith and teachings, is by said
church or association held in trust for that
purpose, and any member of the church or as-
sociation, less than the whole, may not divert it
therefrom. The following cases, more or less
directly sustain the rule, and are but a few
of the many bearing on the question: *Kniskern* v. *The
Lutheran Churches,* 1 Sanf. Ch. 439; *Attorney-General*
v. *Pearson,* 3 Mer. 353; *Baker* v. *Fales,* 16 Mass. 147;
*Stebbins* v. *Jennings,* 10 Pick. 172; *Hale* v. *Everett,* 53
N.H. 9; *Lawyer* v. *Cipperly,* 7 Paige 281; *Baptist Church*

:v. *Witherell*, 3 Paige 296; *Harrison* v. *Hoyle*, 24 O. St. 254; *Field* v. *Field*, 9 Wend. 395, 401; *Miller* v. *Gable*, 10 Paige, 627, 2 Denio, 492; *M. E. Church* v. *Wood*, 5 Ohio, 284; *Happy* v. *Morton*, 33 Ill. 398; *Lawson* v. *Kolbenson*, 61 Ill. 407; *Dublin Case*, 38 N. H. 459; *Watson* v. *Jones*, 13 Wall. 679; *Fadness* v. *Braunborg*, 73 Wis. 257, 41 N. W. Rep. 84; *Presbyterian Church* v. *Congregational Society*, 23 Ia. 567 ; *Schnorr's Appeal*, 67 Pa. St. 138 ; *Roshi's Appeal*, 69 Pa. St. 462.

"The Mt. Zion Baptist Church came into possession and ownership of the property it now holds under a profession of faith and practice limited by the 'articles of faith and church covenants published in the minutes of the Des Moines Baptist Association, in the year 1848,' which we understand to accord with the teachings of the Baptist denomination. These articles of faith and church covenants, and the teachings with which they accord, are a limitation on the trust or use to which the property may be applied. * * * * The council selected by the parties declared, in effect, the doctrines taught by the Smith brothers to be a deadly error, and destructive of the peace of the church. Treating this finding for the present as legitimate and true for the purpose of the case, and the situation is that property given and devoted to the promotion of the Baptist church is being used for its destruction. The appellees' contention because of their claims for the distinctive or independent character of the Baptist church, by which a majority may, without limitation, govern, would permit this result. * * * * The error of appellees in their claim for the 'independency' of the majority in a Baptist church lies in a mistaken conception of what should be understood by 'government.' The power of the majority to govern is derivative, and the source of deriva-

tion limits the power. The organization gave birth to the church, and a power to govern the church. The church is Baptist because of the faith and covenants that make it so. It is not the faith and covenants that need, or are to be governed, but the members in the enjoyment and fulfillment of the same. The power to govern the church gives no power to change the church or the faith and covenants that fix its character. The property of this church is the common property of all its members, and each has such an interest therein that he may insist that it shall be devoted to the religious faith for which it was given.   *   *   *   But there is no delegation of authority to the majority to apply it to the advancement of a church of another faith   *   *   *   or by changing the faith of the majority of the members of the church.   *   *   *   If, perchance, a bare majority of some Baptist church should determine, on Scriptural authority, their right to a plurality of wives, and, against the protests of a minority, devote the property of the church to the advocacy and practice of such a doctrine, under the claim of appellees that the church 'owes no allegiance to any man or body of men, civil or ecclesiastical, except a majority of its members,' the only redress of the minority would be to retire from the church, and leave the property to the majority for such a purpose. Such a surrender of civil rights is without support on any principle of natural justice, and we believe without the sanction of any judicial tribunal."

This case is so nearly the exact case now in hearing, and the points in controversy so nearly the same in both, that it decides every material point contended for by appellees against them, and if it correctly declares the law, as we think it does, it is decisive of this case against appellees. It is true, it differs with this case in that the ecclesiastical decision there was by

a council only, in which the appellees participated, whereas, here the appellees did not participate in either one of the councils that decided against them, though they were invited to do so. But they did participate, or asked recognition as the true church at the hands of the association, the same as the appellants did; and the association was a more extensive ecclesiastical body than the council, and though its powers were like the council, advisory only, they were more extensive. The same conclusion was reached in favor of a minority of a Baptist church of the same faith and order in the Supreme Court of Tennessee. *Nance* v. *Busby*, 18 S. W. Rep. 874. The following cases are closely in point. *Rottman* v. *Bartling* (Neb.), 35 N. W. Rep. 126; *Baker* v. *Ducker*, 79 Cal. 365. See also annotation in 33 L. R. A. 832.

The evidence shows that appellants and the majority were at one time since the division, in possession of the church building, claiming to be the true church, and that appellees, and the majority represented by them, afterward broke open the house by the use of a fence rail, and ever since have had exclusive possession. And ever since that, appellants, and the minority they represent, have kept up a separate organization and church services, claiming to be the true church, and have been ever since so treated and recognized by the Danville Association, while the majority have been disowned by that association. That their action did not take the minority out of Mount Tabor Church, and the action of the majority in excluding them did not have that effect, see *West Koshkonong Congregation* v. *Ottesen*, 80 Wis. 62, 49 N. W. Rep. 24.

We, therefore, conclude that the finding of the circuit court was contrary to law, for which error the motion for a new trial ought to have been sustained.

For this error the judgment is reversed, with instruction to sustain the motion for a new trial.

OPINION ON PETITION FOR REHEARING.

McCabe, J.—Appellees have presented what they call a petition for a rehearing. It is, however, not a petition, measured by the rule of this court, No. 37. It is but an elaborate printed brief or argument, of sixty-two closely printed pages. The rule requires a petition "setting forth the cause for which the judgment is supposed to be erroneous." The same rule also requires a brief in support of the petition. We would be justified in disregarding the so-called petition, but the importance of the questions involved induces us to carefully reconsider the questions discussed in such brief.

The entire argument therein is confined to four propositions: 1. That the opinion is based on an incorrect statement of the facts established by the evidence, to the effect that the appellees, and those represented by them, had departed from the original faith upon which the church was founded; 2, that it was wholly immaterial if they had so departed, so long as they constituted a majority of the membership of the church; 3, that appellants could not recover because all their interest in the church property and the interest of those they represent had ceased by reason of their expulsion from the church before the suit was brought, and 4, that they could not recover even if all other questions of law and fact were decided in their favor, for the reason that appellants were not legally elected trustees, there being no vacancy in the office of trustees of said church, and those electing them not being members of the church

by reason of such expulsion, and not being a majority of the church.

The leading case cited in support of the proposition, that the majority of a church divided into two conflicting bodies may hold the church property, though such majority have abandoned the religious faith on which it was founded, is *Watson* v. *Jones*, 13 Wall. (U. S.) 679. That was a case where the Third Walnut-street Presbyterian Church of Louisville, Kentucky, became divided into two conflicting bodies, each claiming to be the church, and each claiming the right to the control and possession of the church edifice and property. The case has no application here, because the division there did not arise out of any difference in religious faith or belief, nor was there any claim that either side had changed their religious belief from that on which the church was founded. But the division was solely on account of differences in political belief. One side adhered to the cause of the Union during the war of the rebellion, and the other side adhered to the cause of the rebellion.

Appellee's counsel quote most of the following passage in the opinion in that case in support of their contention: "The second class of cases which we have described has reference to the case of a church of a strictly congregational or independent organization, governed solely within itself, either by a majority of its members or by such local organization as it may have instituted for the purpose of ecclesiastical government; and to property held by such a church, either by way of purchase or donation, with no other specific trust attached to it in the hands of the church than it is for the use of that congregation as a religious society.

"In such a case where there is a schism which leads to a separation into distinct and conflicting bodies,

the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations. If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to use the property. If there be within the congregation, officers in whom are vested the powers of such control, then those who adhere to the acknowledged organization by which the body is governed are entitled to the use of the property. The minority in choosing to separate themselves into a distinct body, and refusing to recognize the authority of the governing body, can claim no rights in the property from the fact that they had once been members of the church or congregation. This ruling admits of no inquiry into the existing religious opinions of those who comprise the legal or regular organization; for, if such was permitted, a very small minority, without any officers of the church among them, might be found to be the only faithful supporters of the religious dogmas of the founders of the church. There being no such trust imposed upon the property when purchased or given, the court will not imply one for the purpose of expelling from its use those who by regular succession and order constitute the church, because they have changed in some respect their views of religious truth."

There was not only no case before the court of a church divided into two factions on account of one of them having abandoned the original faith on which it was founded, but the court was not speaking of such a case, nor a violation of a trust arising out of such a case, by the use of the house of worship by the departing majority. The existing religious opinions, the right of inquiry into which is denied in the opinion, has no reference to the original faith on which the

church was founded, but has reference rather to the conflicting views of the two opposing bodies, as to Christian duty to adhere to the lawful government of the country in time of war or rebellion. There was no pretense that the original faith on which the church was founded, in that case, made any declaration on that subject.

There are many minor differences of opinion as to religious duty and practice among the members of the same denomination, and even of the same church upon which the confession or articles of faith are silent. For instance, the propriety of attending balls or dances, playing cards, washing each other's feet, maintaining musical instruments in public worship, and the like, which differences ordinarily furnish no ground for a charge of a desertion of faith. It was such differences that led to the separation of the Third or Walnut-street Church in Louisville, and it was that class of differences the court had in mind in the use of the language above quoted. That it was not intended to apply the language to all cases, is rendered clear by another passage in the opinion, which counsel do not quote and make no mention of. It reads thus: "In such case, if the trust is confided to a religious congregation of the independent or congregational form of church government, it is not in the power of the majority of that congregation, however preponderant, by reason of a change of views on religious subjects, to carry the property so confided to them to the support of new and conflicting doctrine. A pious man, building and dedicating a house of worship to the sole and exclusive use of those who believe in the doctrine of the Holy Trinity, and placing it under the control of a congregation which at the time holds the same belief, has a right to expect that the law will prevent that property from being

used as a means of support and dissemination of the Unitarian doctrine, and a place of Unitarian worship. Nor is the principle varied when the organization to which the trust is confided is of the second or associated form of church government. The protection which the law throws around the trust is the same. And though the task may be a delicate one and a difficult one, it will be the duty of the court, in such cases, when the doctrine to be taught or the form of worship to be used is definitely and clearly laid down, to inquire whether the party accused of violating the trust is holding or teaching a different doctrine, or using a form of worship which is so far variant as to defeat the declared objects of the trust." Therefore, that case not only does not lend any sanction to appellees' contention, but is against it.

The next case cited by appellees' counsel in support of the proposition in question, is *Keyser* v. *Stansifer*, 6 Ohio 363. That also was a suit for possession of a church-house property by Keyser and others, a small faction of a Baptist church, who had separated themselves from the church about a matter that had nothing whatever to do with the original faith upon which the church was founded. And it was held, in accordance with the rule laid down in the last-mentioned case, that in such a division of a church the property, as in ordinary voluntary associations, is held at the will of the majority. The division, in the Ohio case, was caused by the church excluding Keyser on charges preferred against him in the course of discipline for misconduct. He afterwards got another member named Cox and some married women to join him to sue for the church edifice. The ground on which he and his associates claimed that they were the real church, was that sometime after Keyser had been excluded the church adopted new articles of

faith or a creed, and abolished the old. But there is no pretense that the church had abandoned the original doctrine or faith upon which it was founded. The division arose entirely out of the exclusion of Keyser from the church in the course of discipline, and had no reference to any change or departure by the majority from the original faith on which the church had been founded.

The next case cited in support of the right of the majority to rule in matters of this kind, is *Shannon* v. *Frost*, 3 B. Mon. (Ky.) 253. Counsel complainingly remark that "this case was cited by appellees in their original brief. * * But no mention is made of it in the opinion rendered herein. It did not receive the cold respect of a passing glance." Counsel must speak from actual knowledge in making this charge. One of them happens to know that all his statements are true except that that case was in the original brief. Because he knows that that case was not cited in the original brief, but was cited on a separate piece of paper filed nearly a month after the original brief was filed. That paper contained nothing else but a citation of that case, and was filed on the same day the opinion was handed down, and after the case had been decided. Then the writer of the opinion pasted that paper fast to appellees' original brief. He knows it was too late then to give the case even the cold respect of a passing glance, after the cause in which it was cited had been decided. However, this court is not bound to cite and comment on all cases cited by counsel. Such citations may not be worthy of such notice.

But the case has not the slightest bearing on the question of the rights of the majority faction of a divided church, who have departed from the original faith on which the church was founded, as against

a minority faction adhering to such faith. It would be very much in point if there had been a division of the church in that case on a difference of religious belief, but there was no such division in that case.

In that case, seven members of a Baptist church in Frankfort, Kentucky, were regularly excommunicated from the church, presumably for immoral conduct. The expelled members, associating themselves with some other persons professing the same religion, organized themselves into a separate community of professed Christians, elected trustees, which election was ratified by the county court of Franklin county.

Afterwards insisting on their right to enjoy to some extent the house of worship built for and still occupied by the original church, they took possession and made periodical use of it, without the consent and in defiance of the prohibition of the church.

To settle the controversy, the members of the original church sued to enjoin them. The defendants did not claim to own the church edifice, but claimed the right to use it a part of the time, under a statute of Kentucky. That statute provides for the election of trustees by religious societies, and among other things regulates the power and control by such trustees of the house of worship belonging to such church or society. It is also provided therein that in case of a division in any congregation or church from any other cause than immorality of its members, the trustees are not to prevent either of the parties so divided from using the house or houses of worship for the purposes of devotion a part of the time, proportioned to the number of each party.

It was under this provision that the defendants justified their attempted use of the house. There was no question of a difference of religious belief involved in the case between the two parties.

The court of appeals held that the statute did not apply. The only other point decided was as to the legality of the election of the trustees by the plaintiffs after constituting themselves into a new society. That point we shall notice further on. The next case cited in support of the proposition in question is *Petty* v. *Tooker*, 21 N. Y. 267. That case does squarely hold that a religious society, incorporated under the act of the legislature of 1813, in the State of New York, had power, through its trustees, elected under that act, to change from a Congregational to a Presbyterian church, even over the protest of the minority of the members, and carry the church property with them. But that was owing to the peculiar provision of the statute mentioned, and the peculiar construction placed upon it by the court of appeals of that state.

Yet, at the same time, in cases of divided churches, incorporated under previous statutes of that state, it was held uniformly by its courts, in harmony with all authority elsewhere, that a majority could not carry or divert the church property to a contrary doctrine and faith against the objection of a minority of the membership of the church adhering to the original faith on which the church was founded. *Miller* v. *Gable*, 2 Den. (N. Y.) 492; *Kniskern* v. *The Lutheran Churches*, 1 Sanf. Chancery (N. Y.) 439.

But that statute has been since modified in a subsequent act of the legislature of that State. In *Isham* v. *Trustees, etc.*, 63 How. Pr. 465, it was said: "As the act of 1813 has been construed, the members of a religious corporation were under its provisions left at liberty to divert the church property from the dissemination of the views of the persons acquiring it to that of any other view, whether religious or secular, which might be sanctioned and adopted by a voting majority of the congregation. (*Robertson* v. *Bullions*, 1 Kernan,

243; *Petty* v. *Tooker,* 21 N. Y. 267; *Burrel* v. *Associate Reformed Church,* 44 Barb. 282).

"This was an extreme construction of the terms in which the carefully guarded act of 1813 was enacted, and by chapter 79 of the Laws of 1875 the legislature undertook its correction, and for that purpose provided and declared that the trustees of a religious society, incorporated under the act of 1813, should administer its temporalities and hold its property and revenues for the benefit of the corporation, according to the discipline, rules, and usages of the denomination to which the corporation belongs. (Laws 1875, p. 79, section 4.)

"This enactment was preserved and in terms extended by chapter 176 of the laws of 1876. The plain purpose of these acts was to abrogate the rule which had grown out of the preceding construction given to the act of 1813, and to deprive the congregation, as well as the trustees of the society of the power afterwards to divert the church property from the promotion and dissemination of the religious views of the persons obtaining and acquiring it to the promulgation and maintenance of any different systems of religious belief. Instead of holding the property subject, simply, to the disposition of the voting majority of the congregation, the trustees were henceforward to hold and devote it to the uses and purposes of the denomination of Christians in which the society should be included that obtained and acquired it. * * * *

"It was manifestly unjust to allow persons becoming members of a religious society, formed for the purpose of inculcating particular views, by their subsequent votes, to appropriate the property they might have done nothing to acquire to the promotion of views of an entirely different character from those entertained by the persons through whose contributions the prop-

erty may have been obtained. This was the practical abuse which the Laws of 1875-6 were designed in the future to prevent, and they are required to be so construed as to carry that policy into effect." To the same effect are *The Reformed Presbyterian Church* v. *Bowden*, 10 Abb. N. Cas. 1; *Same* v. *Same*, 14 Abb. N. Cas. 356; *Isham* v. *Fullager*, 14 Abb. N. Cas. 363; *Field* v. *Field*, 9 Wend. 395.

It thus appears that *Petty* v. *Tooker*, *supra*, so confidently relied on for a rehearing, is no longer the law or authority either in or out of the state of New York.

Counsel for appellees cite and quote from *Baptist Church* v. *Witherell*, 3 Paige (N. Y.) 296, without definitely stating what point it is designed by it to support, the following passage: "All questions relating to the faith and practice of the church and its members, belong to the church judicatories to which they have voluntarily subjected themselves." If it is meant by this to support the proposition that the majority departing from the faith can hold the property against the minority adhering thereto in a case of division, the answer is that that case was one where the church was incorporated under the act of 1813, and, like *Petty* v. *Tooker*, *supra*, was governed and controlled by that statute, and hence is no longer authority in the state of New York or elsewhere.

But, if it was intended to support the proposition that the action of the judicatories of the Regular Baptist Church are absolutely binding upon the courts, then it is against the appellees, because the undisputed evidence shows that three several judicatories of that denomination had decided that appellees had departed from the faith as expressed in the articles of faith adopted at the foundation of the church, though such decisions were only advisory.

And now, having examined all the cases cited in support of the proposition that the majority of a divided church may repudiate the original faith and hold the property, and having shown that those cases lend no support to such proposition whatever, and that there is no authority to that effect anywhere, we proceed to examine the third proposition, namely, whether the appellants, and those represented by them, ceased to have any interest in the church property by their alleged expulsion from the church. The case last referred to, together with *Lawyer* v. *Cipperly,* 7 Paige (N. Y.) 281, are both referred to as authority that appellants were no longer members of the church, but those cases do not lend any support to the proposition nor to any proposition urged by counsel.

The contention amounts to this: the church, becoming divided into two factions on account of a difference in religious belief and faith, the majority being accused by a minority of departing from the original faith, they sit in judgment in their own case, pass solemn judgment in their favor that they, being a majority, and hence the church, had a right to change the faith, and hence are not guilty of the charge.

Appellees assume the position that the majority had the right to act as the judicatory for themselves, and pass solemn judgment upon their own acts and adjudge that they are not guilty of a departure from the faith. And they condemn and exclude the minority from the church, and thus seek to preclude the civil courts from inquiring into the charge against them. And now they coolly ask this court to adjudge that their action, while acting as judges in their own case, shall be conclusive, not only on the opposite party, but conclusive on the courts as well, that the majority had not departed from the faith, and that the minor-

ity were out of the church and could not raise the question of departure, and are not and were not members of the Regular Baptist Church of Mount Tabor, when this litigation began. This, too, in the teeth of the decision of three of the church judicatories to the contrary. The language employed by the Supreme Court of Iowa, in the case of *Mt. Zion Baptist Church* v. *Whitmore*, 83 Ia. 138, 13 L. R. A. 198, referred to in the original opinion, is so much in point here that we appropriate it. "The minority lay at the door of the majority the charge of heresy. The majority says: 'We constitute the church. All power is vested in the church, and, hence in us. We determine that the charge is false.' This is the precise claim made by the appellees as to the power of a majority, and it is the precise action taken by the appellees as a majority in Mt. Zion Baptist Church, after which the council was called, the action of which it would now repudiate. * * * "The position leads to this: Consider the majority of a particular Baptist church as guilty of the grossest violations of and the widest departure from the church covenants and faith. Being accused by the minority, the accused sit in judgment, which it declares in its own favor, and then pleads the judgment it declares, as conclusive of its innocence, because no other man or body of men has authority to interfere. However such a rule may serve in purely ecclesiastical relations, we unhesitatingly say the civil law will not adhere to it where the result is to divert trust property from its proper channel."

This position of appellees at once assumes the truth of the very proposition that is in dispute, namely, the claim that the majority faction is the real and true Mount Tabor Regular Baptist Church. Having assumed that as a fact, they seek to prove it by showing

that such majority has excluded the minority from the church, and then argue that the appellants being such excluded minority cannot raise the question as to the title to the church property, elect trustees, or dispute the claim of the majority that they are the church, because appellees, being such excommunicated minority, are no longer members of the church, and have no interest in the question as to who constitutes the church, or who owns the church property.

The only thing that can rescue this claim from the charge of unmitigated assumption pure and simple, is the contention that a majority faction of a church divided into two conflicting bodies on account of differences as to the standard of faith is the real and true church. That contention, we have seen, has no foundation in law or authority. To permit such majority, under such groundless assumption, to exclude or excommunicate the minority, who still adhere to the original faith, and claim to be the church so as to affect property rights, would be a reproach to the law. It would be the law making the title to the property turn upon a mere trick. Such action is vastly different from the action of the church in excommunicating members before it had become divided into two conflicting bodies on account of such differences in religious belief. The minority that succeeded in the Iowa case, referred to above, had been excluded from the church by the majority because of their difference in religious belief from the majority, and yet, the claim of the minority that it constituted the real Mt. Zion Baptist Church was sustained by the Supreme Court of Iowa.

There were three churches in Wisconsin, the denominational name by which they were known was Koshkonong's Lutheran Congregations, in Dane and Jefferson counties. The three churches were served

by one pastor.   One was known by the name of the
Eastern Church, another by the name of the Western
Church, and the other by the name of the Liberty
Prairie Church.   The three churches in many things
acted jointly in their business affairs.   Each one of
the congregations became divided on the doctrine of
election.   The different factions in each congregation
became known as Missourians and anti-Missourians.
In an action by one faction against the pastor, repre-
senting the other, for the possession of the church
property, the question of the validity of the exclusion
of one faction by the other being in the majority, be-
came involved in the case, being the case of the *West
Koshkonong Congregation* v. *Ottesen*, 80 Wis. 62, re-
ferred to in the original opinion, the court there said :
"But it is here objected that, even if a corporation was
created by these proceedings, it was simply a corpora-
tion of the anti-Missourian faction, and did not repre-
sent nor succeed to the rights of the pre-existing volun-
tary organization known as the 'Eastern Church;' in
other words, that the anti-Missourian faction had not
only seceded from but had been expelled from the
Eastern Church, and consequently, could form no cor-
poration which would include or become the legal
successor of the voluntary organization known as the
'Eastern Church.'   This objection demands careful
consideration, because, if the anti-Missourians were
not members of the Eastern Congregation, they could
not give the notice required by section 1990, R. S., nor
execute the certificate required by the following sec-
tion, which must be executed by the members of the
society.   The question is, were the members of the
anti-Missourian minority still members of the Eastern
Church?   It is undeniably true that they were mem-
bers of that church up to the time of the troubles in
1885 or 1886.   Have they lost their membership since

that time? Now, if they have lost their membership, it must be in one of two ways—either by voluntary withdrawal or by expulsion. *    *    *

"We cannot entertain for a moment the idea that the action of the Missourian faction in the Eastern Church, in March, 1887, by which they attempted to declare the anti-Missourians as withdrawn or suspended from the church, has in fact affected the rights of the anti-Missourians in the least." The same legal principle, under like circumstances, is distinctly recognized in *Nance* v. *Buby,* 91 Tenn., at page 303, 15 L. R. A. 801.

This is sufficient to dispose of all the cases counsel cite in support of the proposition, that civil courts are not authorized to determine whether the church judicatories decided right or wrong, and hence cannot, in this case, determine whether the minority was wrongfully or rightfully expelled from the church. They quote from *Shannon* v. *Frost, supra,* among others the following passage: "We must take the fact of expulsion as conclusive proof that the persons expelled are not now members of the repudiating church; for, whether right or wrong, the act of excommunication must, as to the fact of membership, be law to this Court. For every judicial purpose in this case, therefore, we must consider the persons who were expelled by a vote of the Church, as no longer members of that Church, or entitled to any rights or privileges incidental to or resulting from membership therein." They cite as sustaining this proposition *Chase* v. *Cheney,* 58 Ill. 509; *The White Lick Quar. Meet. of Friends* v. *Same,* 89 Ind. 136; *Lamb* v. *Cain,* 129 Ind. 486, 14 L. R. A. 518, and *Bouldin* v. *Alexander,* 15 Wall. (U. S.) 131.

There is no question but that the proposition stated is thoroughly settled law. But it is equally true that

in the case from which the proposition is quoted, there was no question made, and none arose or existed in the case, as to the authority of those that performed the act or adopted the resolution or order of expulsion.   It was not denied that it was done by the church.   There was no division of the church on account of differences in religious belief, and there was no division on any other account.   Simply the church expelled seven members, and they, uniting with others, formed a new organization and claimed the right to use the church house a part of the time; contending that they had been wrongfully expelled, but did not deny that the church had expelled them.   But here it is denied that the expulsion was by the church. We agree that no judicial inquiry can be made as to whether the act of the church in expelling members is right or wrong, fair or unfair, so long as such act is in harmony with the law of the church.   Nor can any such inquiry be allowed as to whether the laws, usages, practice, or faith of the church are right or wrong.   That belongs to the exclusive province of the church, to fix, order, and establish.   And when the church acts within its sphere or province, such act or acts are universally held binding and conclusive, not only upon the members of the church, but also on the secular or civil courts, even where the rights of property are involved, and are dependent upon the action, rules or orders of the church.

But it must be the act of the church, and not the act of persons who are not the church.   In this case it was not denied that the church had become divided into two conflicting bodies, the minority charging that the majority had departed from the standard of faith set up at the foundation of the church, and that both factions were claiming to be the church, and both acting accordingly when the expulsion took place.

The evidence shows that each faction, thus claiming to be the church, expelled the other.

How absurd it is, then, to say, as counsel do in this case, that there can be no inquiry beyond the fact of expulsion, to determine whether appellants are still members of the church.

Appellees' proposition is that appellants are not members because they have been expelled by the church. It is not sufficient to make good this claim to prove the mere act of expulsion, because that only proves one part of the claim. The other part is that the act of expulsion was done by the church, not merely by persons claiming to be the church, but by those who were really and truly the church. If the evidence falls short of proving both parts of the claim, then the evidence does not prove the claim that appellants are not members of the church. It is conceded that they were members unless the church has expelled them. The evidence showing that there were two conflicting bodies, each made up of members of this church, and each claiming to be the only real and true Mount Tabor Regular Baptist Church, and each of such bodies having expelled all the members of the other from that church, as shown by the evidence, it inevitably follows that the court must judicially investigate the question which of the two conflicting bodies is the real and true church, before it can determine that anybody has been expelled therefrom and ceased to be a member or members thereof. When such investigation results in establishing that one of these bodies is the real church, that ends the whole controversy in this case, without any inquiry about expulsions; that is so because the expulsions occurred after the division. Appellants' counsel, with tireless ingenuity, put the cart before the horse by first attempting to show that appellants were expelled in

order to reach a resting ground for the claim that appellees, and those represented by them, are the church. But no rational man can say that either of the expulsions mentioned has changed the relations of either body to the church, unless such expulsion was the act of the church.

It was quite unnecessary for appellees' counsel to resort to or rely on the act of expulsion, if their other oft-repeated claim was well founded, namely, that the majority of a church, divided on account of religious differences, is the church. It is conceded that the church was so divided, each of the two bodies claiming to be the only true and real Mount Tabor Regular Baptist Church. Both claims cannot be admitted, hence judicial investigation must inevitably be resorted to, to ascertain which is the true church, and expulsions, since the separation by either side, can throw no light upon that investigation. What is the touchstone that tests which of the conflicting claimants is the true Mount Tabor Regular Baptist Church? This court in *White Lick Quar. Meet., etc.,* v. *Same,* 89 Ind. 136, *supra,* furnished an answer. It is there said: "The title to the property of a divided church is in that part of the organization which is acting in harmony with its own law; and the ecclesiastical laws, usages, customs, principles, and practices which were accepted and adopted by the church before the division took place, constitute the standard for determining which of the contesting parties is in the right. *Watson* v. *Jones, supra; McGinnis* v. *Watson,* 41 Pa. St. 9; *Winebrenner* v. *Colder,* 43 Pa. St. 244; *Schnorr's Appeal,* 67 Pa. St. 138, 5 Am. R. 415; *Roshi's Appeal,* 69 Pa. St. 462, 8 Am. R. 275."

And again, in *Lamb* v. *Cain,* 129 Ind. 510, this court further answered the question thus: "Where it is alleged, in a cause properly pending, that property

thus dedicated is being diverted from the use intended by the donor, by teaching a doctrine different from that contemplated at the time the donation was made, however delicate and difficult it may be, it is the duty of the court to inquire whether the party accused of violating the trust is teaching a doctrine so far at variance with that intended as to defeat the objects of the trust, and if the charge is found true, to make such orders in the premises as will secure a faithful execution of the trust confided. *Watson* v. *Jones, supra; Miller* v. *Gable,* 2 Denio. 492; *Attorney-General, ex rel.,* v. *Pearson,* 3 Mer. 353; *Watkins* v. *Wilcox,* 66 N. Y. 654; *Attorney-General, ex rel.,* v. *Town of Dublin,* 38 N. H. 459; *Happy* v. *Morton,* 33 Ill. 398; *Fadness* v. *Braunborg,* 73 Wis. 257."

The rule, as stated by the Supreme Court of Illinois in *Ferraria* v. *Vasconcellos,* 31 Ill. 54, 55, and recognized by a great many decisions in courts of last resort in other states, is as follows: "As a matter of law, as I understand the decisions, the rule is that where a church is erected for the use of a particular denomination, or religious persuasion, a majority of the members of the church cannot abandon the tenets and doctrines of the denomination, and retain the right to the use of the property; but such secessionists forfeit all right to the property, even if but a single member adheres to the original faith of the church. This rule is founded in reason and justice, and is not departed from in this case. Church property is rarely paid for by those alone who there worship, and those who contribute to its purchase or erection are presumed to do so with reference to a particular form of worship or to promote the promulgation or teachings of particular doctrines or tenets of religion, which, in their estimation, tend most to the salvation of souls; and to pervert the

property to another purpose is an injustice of the same character as the application of other trust property to purposes other than those designed by the donor. Hence it is, that those who adhere to the original tenets and doctrines for the promulgation of which a church has been erected, are the sole beneficiaries, designed by the donors; and those who depart from and abandon these tenets and doctrines cease to be beneficiaries, and forfeit all claim to the title and use of such property. These are the principles on which all these decisions are founded; and so long as we keep these principles distinctly in view, we can have no great difficulty in applying them to the facts of each particular case.   *   *   *   ."

The same rule was stated by the Supreme Court of Iowa, in *Mt. Zion Baptist Church* v. *Whitmore, supra,* as follows: "Upon authority so general as to be beyond question it is held, that property given or set apart to a church or religious association, for its use in the enjoyment and promulgation of its adopted faith and teachings, is by said church or association held in trust for that purpose, and any member of the church or association less than the whole, may not divert it therefrom." Accordingly, it is said by Sharswood, J., speaking for the Supreme Court of Pennsylvania, in *Schnorr's Appeal,* 67 Pa. St., cited in the original opinion, that: "In church organizations, those who adhere and submit to the regular order of the church   *   *   *   though a minority are the true congregation and corporation, if incorporated." Chief Justice Shaw, speaking for the Supreme Court of Massachusetts in a similar case, *Stebbins* v. *Jennings,* 27 Mass., at page 181, said: "That an adhering minority of a local or territorial parish, and not a seceding majority, constitutes the church of such parish to all civil purposes, was

fully settled in *Baker* v. *Fales*, 16 Mass. R. 503, and *Sandwich* v. *Tilden*, there cited." To the same effect is *Roshi's Appeal*, *supra*, and many other cases, too numerous to cite. Therefore, it follows that if the minority were acting in harmony with the ecclesiastical laws of the church, and were adhering to the faith, and the majority were not, the minority, in law, was the real and true Mount Tabor Regular Baptist Church.

One of the very cases relied upon by appellants' counsel, *Bouldin* v. *Alexander*, 15 Wall, 139, 140, the Supreme Court of the United States said: "It may be conceded, that we have no power to revise or question ordinary acts of church discipline, or excision from membership. We have only to do with the rights of property. As was said in *Shannon* v. *Frost*, we cannot decide who ought to be members of the church, nor whether the excommunicated have been regularly or irregularly cut off. We must take the fact of excommunication as conclusive proof that the persons exscinded are not members. But we may inquire whether the resolution of expulsion was the act of the church, or of persons who were not the church and who consequently had no right to excommunicate others."

It follows, as conclusively as that two and two make four, that appellants, and those acting with them, did not cease to be members of the church by the act of the majority in expelling them, if we were right in the original opinion in holding that such majority had departed from the chosen faith, declared in the articles of faith adopted at the foundation of the church, and were teaching doctrines contrary thereto, because the unbroken line of judicial authority everywhere, as we have seen, declares the law to be, in such case, that such majority was not the real and true

Mount Tabor Regular Baptist Church, and could not expel anybody from it, but that the minority represented by the appellants, were that church, because they were acting, as we there held, in accordance with the law of the church in adhering to the faith, and teaching the doctrines expressed in such articles of faith.

This brings us in the natural order to the first proposition on which a rehearing is asked, namely, that our former conclusion that the evidence showed such departure from the faith by the appellees, and those represented by them, the majority, is based on an incorrect statement of the facts established by the evidence.

The conflicting doctrines held by the two bodies are known as the "means doctrine," held to by the majority, and the "anti-means doctrine," held to by the minority. The epitome of the two doctrines may be stated thus: The "anti-means doctrine" is a belief and faith that conversions of sinners to Christianity and the salvation of human souls is not and cannot be brought about or aided by any human means or effort whatever, but that the same must be and is wholly and entirely the work of the Lord. The "means doctrine" is a belief and faith in the exact opposite, that such conversions and salvation may be aided by the use of human means.

There is no controversy about the meaning of the two terms "means" and "anti-means," nor as to the conflicting beliefs as above expressed, but the strange charge is now made that the "anti-means" party are the ones that have departed from the faith, and that the "means doctrine" was the original doctrine of the church. And out of the vast volume of about 600 pages of evidence appellees' learned counsel are only

able to point to these lines in evidence as establishing that fact in the testimony of Elder Shirley, to-wit: "It—Mount Tabor Church—has always been means since my knowledge of it. So far as I know of its church history it has been means since the beginning of its constitution."

Counsel say of this evidence, that: "On the other hand, the appellants did not introduce a single witness to contradict the testimony of Elder Shirley on that proposition, or prove that Mount Tabor Church was or ever had been anti-means in its doctrines or teachings, and not a single witness so testified. In the evidence of all the witnesses examined during the protracted trial of this case, there was not a word from any one of them to sustain the assumption on which this opinion is predicated, that the 'means' party had departed from the faith on which Mount Tabor Church was constituted." This sweeping and startling declaration is made in defiance of, and by ignoring the conclusive documentary and other evidence adduced. It treats the articles of faith put in evidence, as having no force, and it ignores the evidence of the solemn decisions of two councils of the churches, and the decision of the Danville Association, that the majority, or "means" party, had departed from the faith as expressed in the articles of faith, and that the "anti-means" party, the minority, were still adhering to that faith, and were the real and true and only Mount Tabor Regular Baptist Church. It is true, the decisions of these three ecclesiastical tribunals recognized judicatories of that church, were not conclusive on the parties according to the governmental polity of the church, but advisory only; but nevertheless, as was said by the Supreme Court of the United States in *Bouldin* v. *Alexander*, *supra*, such decisions "are persuasive evidence" of the facts thus decided.

And here we notice, counsel urge that appellants relied hitherto on the theory that the decision of the Danville Association was conclusive evidence of such departure, and we, having decided that it was not conclusive, but advisory only, appellants, it is contended, must succeed on that theory or fail. The theory on which the appeal was sought to be maintained, is that the finding was contrary to law, in that it was contrary to the evidence. Appellants' contention that the decision of the Danville Association was conclusive evidence of the charge of departure, was not inconsistent with the specification in the motion for a new trial, that the finding was contrary to the law and the evidence in the case. It was not essential to that theory that the evidence, or one item of it, should be conclusive against appellees, but it was a sufficient maintenance thereof that the finding was contrary to the evidence, without showing that any particular item of it was conclusive of the fact it tended to prove.

Two of the articles of faith read thus: "Fourth—We believe in the election by grace, according as He has chosen us in Him before the foundation of the world, that we should be holy and without blame before Him, in love, having predestinated us to the adoption of children by Jesus Christ, to crown us according to the good pleasure of His will. Fifth—We believe that sinners are justified by the righteousness of God, which is in Christ Jesus imputed to them by Divine and supernatural operation of the spirit of God, and that they are kept by the power of God through unto salvation." In all this long controversy it has never been hinted by a single witness that this declaration of faith was consistent with the means doctrine, nor have counsel for appellees, in all their long and earnest argument, either on the original hearing or on this petition for rehearing, claimed that

the decisions by the three several judicatories of the church had wrongly construed the articles of faith to be in conflict with the "means doctrine."

Nor is there a scintilla of evidence that there was ever but the one construction put upon this declaration of faith. What, then, was this long protracted hearing of evidence about, occupying about ten days, if the item of evidence we have quoted was uncontradicted? Why it was all, except that item, devoted to an effort on the part of appellees to prove that the majority in a church with a congregational form of government, as here, could change at pleasure their standard of faith. Hence it was that the discussion of the item of evidence in question in appellees' original brief occupied only two lines, and in the present brief of over sixty pages, only a little over a page is devoted to this item of evidence. The whole evidence proceeded on the theory of a conceded departure in faith by the majority and an attempted justification thereof on the ground that the majority had the right to change or alter the faith and doctrine of the church, unless the item of evidence in question can be construed as a denial of such departure by the majority. That theory still occupies all of appellees' elaborate brief except a page or two. But there is still another item of evidence of a very vital and controlling character that counsel ignore. And that is, that the church record, put in evidence, shows that when the church was organized it was named a "Regular Baptist Church," and its denominational name has never been changed.

No principle is better settled than that property conveyed to trustees for the use of a church by its denominational name, as was the case here, creates a trust, for the promulgation of the tenets and doctrines of that denomination. *Hale* v. *Everett*, 53 N. H. 9, s. c.

16 Am. R. 118, 191; *Ferraria* v. *Vasconcelos, supra; Kniskern* v. *Lutheran Churches,* 1 Sanf. Ch. *supra; First Presbyterian Church* v. *Bowdin, supra; Miller* v. *Gable, supra.*

History records that one branch of the Baptist denomination is what is known as, and called Regular Baptists. History says that they are strongly Calvinistic in doctrine. American Church History, vol. 1, p. 19. A summary of their articles of faith, by the same history, is stated as follows: "Articles 1 and 2 state the doctrine of the Trinity, and accept the Scriptures of the Old and New Testament as the word of God and only 'rule of faith and practice;' Article 3 declares that 'God chose his people in Christ Jesus before the foundation of the world' and 'predestinated them unto the adoption of children;' Article 4, that man is a sinner and consequently in a lost condition; Article 5, that he has no power of his own free will and ability to recover himself from his fallen state; Article 6, that sinners are 'justified in the sight of God only by the righteousness of Jesus Christ;' Article 7, that the elect are 'called and regenerated by the Holy Spirit through the Gospel;' Article 8, that nothing can separate true believers from the love of God, and that they shall be kept by the power of God through faith unto salvation." American Church History, Vol. 1, p. 21, 1893.

This is Calvinistic doctrine, and corresponds exactly to the doctrine designated in the evidence as "antimeans" doctrine. Tyler's Ecclesiastical Law, sections 830, 831.

The doctrine designated in the evidence as the "means doctrine" corresponds exactly to what is known as Arminian doctrine. Tyler's Ecclesiastical Law, sections 830, 831.

These two doctrines, in the light of historical facts, of which courts take notice, are recognized as in irreconcilable conflict in *Miller* v. *Gable, supra.*

But there is another item of vital and controlling evidence which counsel ignore. It is evidence which shows that appellees, and the majority acting with, and represented by them, construed the articles of faith and the denominational tenets of the Regular Baptist Church to be in conflict with the "means doctrine," just as the two councils and the association had. After a two years' struggle by the contending factions, seeking recognition and admission to the Danville Association, to which the church belonged, and each claiming that it was the only true Mount Tabor Regular Baptist Church, the majority party was disowned and refused admittance because of such departure from the faith, and the minority party received and recognized as the church; the majority party went home and organized a new association, and after grave deliberation, they named it "The Mount Tabor Means Baptist Association." Thus it will be seen that the denominational name of Regular Baptist was changed by dropping out the word regular, which distinguishes that denomination of Baptists in the United States from twelve or thirteen other denominations of Baptists. And in the place of the word "Regular" they substituted the word "means." American Church History, Vol. 1, p. 18. There is no such church known to history as Means Baptists.

If the church was and always had been a "means" church, if the denominational faith and belief was in the means doctrine, then the denominational name of "Regular Baptist" carried that idea with it, and there was no cause for changing it. As was said in *Hale* v. *Everett, supra:* "A society which should take for its name 'The First Society of Roman Catholics in C,' or

'The First Society of Presbyterians in C,' or 'The First Society of Quakers in C,' would be understood as made up of persons of the sect which the name of the society indicated; and if a donation of a church had been made to certain persons   *   *   *   to be forever subject to the control of the First Society of Roman Catholics in C   *   *   *   the trust would have been held subject to the control of such of the society, and such only, as adhered to the fundamental doctrines of the society as indicated by the name, even though they might be a minority of those who at first were numbered among its members."

By dropping out the very word, and the only word, from the denominational name that distinguished the denomination from twelve or thirteen other sects of Baptists, and substituting in its place the word "means," about which the whole trouble had arisen, is an act that as plainly construes the articles of faith and the tenets of the denomination to be in conflict with the means doctrine, as any act could be on the part of the majority. If the means doctrine was taught in the articles of faith, if it belonged to the tenets of the denomination, the majority would have refused to the last to change the name.

This change was a frank confession, on the part of the majority, at a time, perhaps, when the uppermost thought in their minds was to express their belief that the denominational name "Regular Baptist Church" did not carry with it a correct expression of their religious faith and belief, and that the articles of faith did not do so. And the act of the minority in adhering to the old name is equally significant. Thus it is that the majority, represented by the appellees, have, by an unequivocal act, placed the same construction upon the articles of faith and the tenets of the denomination that the minority, the two councils and the as-

sociation have in deciding that the means doctrine is a departure from the faith as expressed in the articles of faith.

And the civil courts accept the construction placed upon the ecclesiastical laws of an ecclesiastical body by such body as binding on the civil courts. *Lamb* v. *Cain, supra; White Lick, etc.,* v. *White Lick, etc., supra; Mt. Zion Baptist Church* v. *Whitmore, supra.*

Here, both the conflicting bodies, as well as the ecclesiastical courts of the denomination, have so construed the articles of faith and the denominational tenets as to hold, impliedly at least, that the means doctrine is a departure therefrom. That construction is binding on this court.

The articles of faith being a solemn written compact, are conclusive on the question of faith.

If the item of testimony, quoted from Elder Shirley, was in conflict with the articles of faith thus construed, his testimony being oral only, it cannot be considered in opposition to the written compact. *Robinson* v. *Snyder,* 97 Ind. 56; *Oiler* v. *Rodkey,* 17 Ind. 600; *Symmes* v. *Brown,* 13 Ind. 318. But, aside from that, his testimony, when examined, may be harmonized with all the other evidence, which it is the duty of the court or jury to do, if that can be reasonably done.

He was speaking from his standpoint. He, and all the witnesses on that side, were testifying that the majority constituted the church. As the learned counsel have, in the brief on this petition, repeated nearly fifty times, that the majority is the church and the church is the majority. He said: "So far as I know of its church history, it has been means since the beginning in its constitution," that is, according to all the witnesses on that side, the majority is the church. Therefore, he means that the majority, so far

as he knows, believes in the means doctrine. That fact was not denied. How it was at the constitution of the church he does not state. What did he know? He was speaking more than fifty years after the church was founded, and only spoke so far as he knew. He testified that he was but a boy in 1859, which was twenty-four years after the church was founded. He did not profess to know what the original faith was, on which the church was constituted. Such testimony, it has been held, affords no information as to what the original faith was on which the church was founded, and the faith at that time is the vital and turning point. *Kniskern* v. *Lutheran Churches, supra; Roshi's Appeal, supra;* so that there is really no conflict between the item of testimony in question and the articles of faith, and other evidence as to what the original faith of the church was; but if there was such conflict the solemn written compact must be held conclusive.

The fourth and last proposition made is, that appellants were not legally elected trustees by the minority, because there was no vacancy in such offices, and that a minority could not elect, and hence appellants could not maintain this suit. In *Schnorr's Appeal, supra,* Sharswood, J., speaking for the court, said: "The corporation or society are trustees, and can no more divert the property from the use to which it was originally dedicated, than any other trustee can. If they should undertake to divert the funds, equity will raise some other trustee to administer them and apply them according to the intention of the original donors or subscribers." That was a case where both factions, as here, had elected trustees. To the same effect are several of the cases cited in this and the original opinion.

But there is another, and perhaps a more conclusive

reason why the legality of the election of the appellees in this case is not to be considered, and that is there was no issue under which the authority of the appellants as trustees to sue could be inquired into.

The complaint shows on its face that appellants sued in their capacity as trustees of Mount Tabor Regular Baptist Church.

The only answer to the complaint reads thus: "The defendants in the above case for answer say, that the said Albert Smith, Samuel Schenck and Thomas Shepherd are not the trustees of the Mount Tabor Regular Baptist Church, and were not at the time of the commencement of this action; that the defendants, Robert G. Pedigo, Preston Smith and Levi Shirley, are the trustees of said church and corporation, and were so at the time of the commencement of this suit, and the said defendants deny each and every allegation in said complaint contained. Wherefore they demand judgment for costs and all proper relief." This answer was verified. But it was a palpable attempt to defeat the merits by dilatory matter in abatement, that has nothing to do with the merits by commingling them together. They sought to try the merits under cover of matter in abatement; and failing in their defense on the merits, fall back on the matter in abatement, and insist, not on abating the suit, but on a finding and judgment in their favor on the merits. The common law would not permit this to be done, and for a long time our code was construed not to have changed the common law in this respect, but it was afterwards construed to have modified the common law so as to allow matter in abatement and in bar to be pleaded together in the same answer. But immediately thereafter the legislature enacted the following: "Pleadings denying the jurisdiction of the court, or in abatement of the action, and all dilatory pleadings, must

be supported by affidavit. The character or capacity in which a party sues or is sued, and the authority by virtue of which he sues, shall require no proof on the trial of the cause, unless such character, capacity, or authority, be denied by a pleading under oath, or by an affidavit filed therewith. An answer in abatement must precede, and cannot be pleaded with an answer in bar, and the issue thereon must be tried first and separately. If the issue be found against the answer, the judgment must be that the party plead over, and against him for all costs of the action up to that time." R. S. 1894, section 368 (R. S. 1881, section 365).

It was held, before the enactment of this statute, that the authority of a party to sue could only be put in issue by a plea in abatement verified. *Nolte* v. *Libbert, Admr.*, 34 Ind. 163. It has also been held by this court that at common law, as well as under this provision of the code, that matter in abatement must precede, and cannot be pleaded with matter in bar. *Field* v. *Malone,* 102 Ind. 251; *Dwiggins* v. *Clark,* 94 Ind. 49; *Moore* v. *Harmon,* 142 Ind. 555.

It was frequently held, prior to the enactment of the revision of the code above quoted, that a plea in abatement, along with one in bar, is a waiver of the matter in abatement, and that such matter in abatement cannot be considered by the court. *Kenyon* v. *Williams,* 19 Ind. 44; *Jones* v. *Cincinnati, etc., Co.,* 14 Ind. 89; *Keller* v. *Miller,* 17 Ind. 206. And since that enactment the same rule was applied in *Field* v. *Malone, supra,* at pages 256-7, where this court said: "The appellee insists that the plea in abatement, having been filed with the general denial, and forming the second paragraph of the same answer, cannot be considered. * * * And this unquestionably was the rule under the common law, and is the rule under the present code."

The answer here did not ask to abate the action, but asked judgment on the merits for the defendants. Therefore, under the statute and the previous decisions of this court, the matter in abatement was waived, thus making it wholly unnecessary to prove the character or capacity in which appellants sued.

Petition overruled.

### DISSENTING OPINION.

HOWARD, J.—With the greater part of the original opinion in this case, as well as of the principal opinion on the petition for a rehearing, I fully concur. There can be no question that those who retain the original faith of a church or congregation are entitled to retain also the property acquired by or given to such church or congregation. Those who fall away from the original faith, whether the majority or the minority can have no right to take with them any of the property of the church. The property having been given to the church, or acquired by it, for the purpose of sustaining or spreading the belief taught by the church and the practice of its doctrine, it would be manifestly inequitable that members afterwards rejecting the faith should have any part in the property used in disseminating the same faith. I am of opinion, however, that there was evidence in this case quite sufficient to sustain the finding of the trial court, and, this being true, that we have no right to disturb the judgment so rendered. The evidence, as I read it, and even the original articles of faith and practice, and the code of rules adopted by the church on its organization, sustain the finding that Mount Tabor Regular Baptist Church taught from the beginning the faith now professed by the appellees, and hence, that it was a Means Church from its foundation. The decisions of the various councils, and of the Danville Association, are all con-

fessedly but evidence of what was the original belief of the church. But, besides this evidence, there was ample evidence also, given by many learned teachers and doctors of the Baptist church, going to show that the Mount Tabor Church was always a means, and not an anti-means church; in other words, as its articles of belief and rules of decorum seem to show, that, while the church believed in election by grace and justification by the righteousness of God; yet it also believed that they that have done good shall rise to eternal life, and they that have done evil to eternal damnation; that is, that men may be brought to God by human means, God is making use of the instrumentality of man.

Much evidence was also given to show that, by the original constitution of this church, the form of government is that the majority vote is the voice of the church, even in articles of faith; that each church must put its own construction upon the Scriptures, and that this must be done by a majority vote. There is no appeal to any other authority. The local church is supreme. The record further shows that, as a matter of fact, the anti-means minority was not expelled for any belief or want of belief, but "for disorderly conduct in declaring an unfellowship for a portion of the members of Mount Tabor Church."

The evidence here referred to was believed by the trial court, who therefore found that the means majority were the true Mount Tabor Church, and rightfully entitled to the church property. I am at a loss, consequently, to know how we can, consistently with the rules of this court, disregard the finding so made, and reverse the judgment based upon it.

For the reasons here given, I must dissent from the conclusion reached by the majority of my brethren.